GENESCO, INC.

v.

·JOINT COUNCIL 13, UNITED SHOE
WORKERS OF AMERICA, AFL–
CIO, et al.

United States District Court
S. D. New York.
May 8, 1964.

Seligman & Seligman, by Madeline Balk, New York City, for plaintiff.

Lieberman, Katz & Aronson, New York City, for defendants.

BONSAL, District Judge.

This is a motion by defendants before answer under Fed.R.Civ.P. 12 to dismiss the causes of action alleged in the complaint on various grounds and for alternative relief. The plaintiff, Genesco, Inc., filed its complaint on June 14, 1963, in which jurisdiction is founded on diversity of citizenship, and on the Labor-Management Relations Act of 1947, as amended [L.M.R.A. §§ 301 and 303 (29 U.S.C. §§ 185 and 187)]. The complaint alleges that plaintiff is a Tennessee corporation, engaged in the manufacture, wholesale distribution and retail sale of shoes, having an office in New York City, and that defendant Joint Council 13, United Shoe Workers of America, AFL–CIO (the Union) is an unincorporated association with its principal office in New York City.

The complaint alleges four causes of action: First, breach of two collective bargaining agreements between plaintiff and the Union; second, violation of Section 303 of the L.M.R.A. by the Union; third, inducement by defendants of other labor organizations to break their collective bargaining contracts with plaintiff; and fourth, the taking of certain specified actions by the Union "as part of a plan or scheme to destroy the plaintiff's business."

Each of plaintiff's causes of action and defendants' motions with respect thereto will be considered separately.

*Plaintiff's First Cause of Action:*

Plaintiff alleges that collective bargaining agreements existed between plaintiff and the Union, dated as of October 31, 1962, one such agreement covering plaintiff's 23rd St. shoe factory and the other covering its 11th St. shoe factory (both located in Long Island City, New York, and operated as a Division of plaintiff under the name I. Miller Shoe Company); that each of said collective

bargaining agreements contained a no strike clause,[1] and that commencing on or about November 6, 1962 the Union struck plaintiff's plants in violation of said clause.

Defendants move to dismiss the first cause of action on the ground that the collective bargaining agreements of October 31, 1962 contained arbitration clauses which applied to a strike in violation of the agreement. Defendants state that "[i]n making this motion the defendants specifically reserve the right, at a future time and in the appropriate forum to assert the defense that no collective bargaining agreement was in fact entered into by the defendants covering the period in question".

Since defendants posed an issue of fact as to whether or not collective bargaining agreements were in force between plaintiff and the Union at the time of the alleged strike, the Court directed a hearing to take testimony and to receive documentary evidence on this issue. The hearing was duly held on February 5–6, 1964, at which both sides gave testimony and introduced exhibits. Briefly summarized, the facts developed at the hearing were as follows:

Plaintiff, at the time of the strike, was a member of the Shoe Manufacturers Board of Trade of New York, Inc. (Board of Trade), a New York membership corporation composed of employers, which at least since June 15, 1948 had acted for its members in negotiating collective bargaining agreements with the Union. The agreement of June 15, 1948 was extended from time to time, with changes in pay scales, working conditions, etc., the last undisputed extension expiring on October 31, 1962.

On August 29, 1962, the Union addressed identical letters to I. Miller Shoe Co. and to the other nine members of the Board of Trade, giving notice of the termination on October 31, 1962 of the then current contract and offering to meet with such member at the office of the Board of Trade for the purpose of negotiating a new contract. Simultaneously, the Union wrote Mr. Benjamin Seligman, of Seligman & Seligman attorneys for the Board of Trade, and sent him a copy of its notice to the members, stating in its covering letter its understanding that the members "will be represented by your organization [the Board of Trade] in the coming negotiations for a collective bargaining contract". The Board of Trade had a negotiating committee composed of one representative of each of the members.

1. "*TWENTIETH:* (a) Any question in dispute between the parties arising out of or in relation to this agreement shall be adjusted between the Union representatives and representatives of the Firm. Upon failure of such representatives to reach an agreement, the matter in dispute shall be submitted to the Impartial Arbitrator whose decision and award shall be final and binding on both parties. The parties agree not to delay arbitration when either party considers such action necessary. Expense of arbitration is to be paid equally by the parties.

"The parties agree, that the Impartial Arbitrator under this agreement shall be Hon. Walter Brower, 165 Broadway, New York, New York.

"(b) There shall be no lockout, slowdown, strike or stoppage of work in the shop or any department thereof pending the determination of any complaint, or pending the fixing or adjustment of prices or grievances, or pending the determination by the Impartial Arbitrator of any complaint, price or grievance, or at any other time during the life of this agreement. This clause is of the essence of the agreement. In no event, however, shall there be any liability on the part of the UNITED SHOE WORKERS OF AMERICA, C.I.O., District Council No. 3, JOINT COUNCIL No. 13, or of any local Union affiliated with UNITED SHOE WORKERS OF AMERICA, or of any of their officers, or agents by reason of such violation of this agreement, unless such violation is expressly authorized or ratified by the party against whom any claim or liability is asserted by reason of such violation. It is further understood and agreed that all claims, issues, controversies or disputes arising out of violations of this clause shall be settled by arbitration."

(Paragraph TWENTIETH is incorporated into the alleged agreements of October 31, 1962 by reference to an agreement dated as of June 15, 1948. See this page, infra.)

The negotiations dragged on, and no agreement having been reached on October 31 when the old contract expired, the Union struck the members of the Board of Trade.

Further negotiations were carried on by the Board through Seligman & Seligman, in the course of which the Union informed the Board of the terms of a settlement it was making with another employers' group (the Quality Group). After consideration of these terms, the Board of Trade notified the Union by telegram on November 5, 1962:

"THE SETTLEMENT IS ACCEPTABLE TO MEMBER FIRMS OF THE SHOE MFRS. BOARD OF TRADE. WE WILL MEET WITH YOU TO WORK OUT CONTRACT LANGUAGE. IN VIEW OF THE ABOVE WE REQUEST YOU HAVE EMPLOYEES OF MEMBER FIRMS REPORT FOR WORK TUESDAY, NOV. 6.

SHOE MFRS. BOARD OF TRADE
By: IRVING SCHNEIR, PRES."

Later on November 5, the officers of the Union went to the offices of Seligman & Seligman with a number of unsigned contracts in blank embodying the settlement. Mr. Benjamin Seligman read the form of contract and informed the Union officials that it was acceptable to the Board of Trade. Following previous practice, the plan was that the authorized Union officer would then sign all the blank contracts and deliver them to Mr. Seligman, who would arrange to have contracts signed individually by each member of the Board of Trade, and one signed copy returned to the Union.

While there is some conflict in the testimony as to what happened at this meeting, it appears that immediately before the authorized Union official began to sign the blank contracts, or after the signing had begun, that the Union officials informed Mr. Seligman that the new contract would not be entered into with the two I. Miller Shoe Co. factories unless the plaintiff agreed to transfer the manufacture of its "Act II" shoes from their 11th St. plant to their 23rd St. plant. The testimony revealed that there had been prior conferences regarding the Act II issue, and that plaintiff considered that it should be resolved through the grievance machinery of the contracts, while the Union considered that it should be negotiated separately. The Union officials testified that at one of the prior conferences they informed Mr. Seligman that as the end of the previous contract was approaching, the Union must know plaintiff's position on the Act II issue, and that Mr. Seligman assured them the issue would be no problem. Mr. Seligman, however, denied that the Union officials had mentioned the Act II issue at this conference. At the November 5 conference the Union took the position that the Act II issue must be resolved before it would enter into the new contracts with plaintiff, while Mr. Seligman who appears to have been acting for both the Board of Trade and the plaintiff, argued that the new contract had been accepted by the Union and the Board of Trade, and that the Union could not discriminate against one of the members of the Board of Trade by insisting on the settlement of the Act II issue as a condition. While the argument was continuing, Mr. Seligman telephoned plaintiff's office in Nashville, Tennessee, and informed its Vice-President, Mr. Buchanan, of the problem, and it was arranged that Mr. Buchanan would meet with Mr. Seligman and the Union officials in New York the following morning to discuss it. The authorized Union official, Mr. Scimeca, completed the signing of the blank contracts and delivered them to Mr. Seligman, but neither side changed its position on the Act II issue. Mr. Seligman was informed at the close of the meeting by the Union officials that the I. Miller employees would not return to work the next day. The Union officials testified that Mr. Seligman promised that the contracts would not be presented to plaintiff for signature; Mr. Seligman testified that he did not make any such promise.

Following the Nov. 5 meeting, the Union called off the strike effective Nov. 6, except as to plaintiff's two factories.

On the morning of Nov. 6 the conference which had been arranged the previous evening with respect to the Act II issue, was held, but no agreement was reached. Later on Nov. 6, plaintiff telegraphed the Union as follows:

"AN AGREEMENT HAS BEEN NEGOTIATED AND EXECUTED BETWEEN THE SHOE MANUFACTURERES [sic] BOARD OF TRADE AND YOUR UNION, WHICH AGREEMENT CONTAINS A NO STRIKE NO STOPPAGE PROVISION AMONG OTHER CLAUSES. THE SHOE MANUFACTURERS BOARD OF TRADE ACTED AS BARGAINING AGENT FOR ALL ITS MEMBER FIRMS. L [sic] MILLER AS A MEMBER FIRM WAS COVERED BY AND INCLUDED IN SAID CONTRACT NEGOTIATIONS AND COVERED BY SAID CONTRACT. I MILLER WAS ONE OF THE COMPANIES INCLUDED IN THE GROUP ON WHOSE BEHALF THE SHOE MANUFACTURERES [sic] BOARD OF TRADE ACTED AS BARGAINING AGENT, AND WAS AT ALL TIMES KNOWN TO YOUR UNION AS SUCH MEMBER, AND AS COVERED BY THE NEGOTIATIONS AND CONTRACT TERMS. IN FACT, AN OFFICIAL OF I MILLER ACTED AS A MEMBER OF THE ASSOCIATION'S BARGAINING COMMITTEE AND ATTENDED ALL NEGOTIATION MEETINGS WITH YOUR UNION. AFTER ALL TERMS AND CONDITIONS OF SAID AGREEMENT HAD BEEN AGREED UPON AND ENTERED INTO, YOUR UNION FOR THE FIRST TIME, AND WITHOUT EVER PRESENTING ANY SUCH DEMANDS TO THE ASSOCIATIONS BARGAINING AGENT STATED THAT THE EMPLOYEES OF I MILLER COCERED [sic] BY SUCH UNION CONTRACT WOULD BE DIRECTED TO ENGAGE IN A STRIKE AND WORK STOPPAGE EVEN THOUGH AN AGREEMENT HAD BEEN REACHED BETWEEN THE BARGAINING AGENT FOR THIS COMPANY AND YOUR UNION. THE REASON GIVEN WAS THAT A SPECIAL DEMAND WAS BEING PRESENTED AT THIS TIME, TO WIT, THAT ITS LINE OF SHOES KNOWN AS ACT IT [sic] MUST BE MADE IN A DIFFERENT PLANT FROM WHERE SUCH SHOES HAD BEEN MADE FROM THE INCEPTION OF PRODUCTION, EVEN THOUGH BOTH PLANTS ARE COVERED BY YOUR UNION AGREEMENT. SUCH DEMAND AND YOUR ACTION IN ENGAGING IN A STRIKE AFTER AN AGREEMENT HAD BEEN REACHED BY THE PARTIES VIOLATES THE AGREEMENT AS NEGOTIATED. DEMAND IS HEREBY MADE YOU FOR COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE AGREEMENT AS NEGOTIATED AND IN EFFECT BETWEEN YOUR UNION AND THE MEMBER FIRMS OF THE SHOE MANUFACTURERES [sic] BOARD OF TRADE AND PARTICULARLY I MILLER. IN ACCORDANCE WITH THE TERMS OF SUCH AGREEMENT THE EMPLOYEES OF I MILLER SHOULD BE DIRECTED TO FORTHWITH REPORT FOR WORK. UNLESS SAID EMPLOYEES RETURN TO WORK, YOU WILL BE HELD LEGALLY RESPONSIBLE FOR ALL LOSS AND DAMAGES SUFFERED, AND ACTION WILL BE INSTITUTED AGAINST YOU IN THE COURTS AND TRIBUNALS HAVING JURISDICTION. I. MILLER SINCERELY HOPES THAT YOU

DO NOT COMPEL IT TO TAKE SUCH ACTION. YOU MAY BE ASSURED, HOWEVER, THAT UNLESS THERE BE COMPLIANCE BY YOU WITH THIS AGREEMENT BY WEDNESDAY MORNING, NOVEMBER 7, 1962 I. MILLER WILL TAKE ALL LEGAL ACTION TO REQUIRE YOU TO COMPLY WITH ALL TERMS OF THE AGREEMENT AND WILL HOLD YOU LIABLE FOR ALL DAMAGES SUSTAINED. THEREFORE WE URGE YOU TO RECONSIDER THIS UNWISE AND ILLEGAL ACTION TAKEN BY YOU. OUR FACTORY DOORS ARE OPEN AWAITING RETURN TO WORK OF OUR EMPLOYEES

I. MILLER & SONS CO
BY GEORGE COLLINS."

On November 7, the Board of Trade wired the Union, requesting that it abide by the no strike clause in the new contract and immediately order its members to return to work in plaintiff's plants. Also on November 7, Mr. Seligman returned to the Union the contracts which the Union had signed in blank on November 5. These contracts had been signed by eight members of the Board of Trade (including two contracts signed by plaintiff). On November 8 the Union returned to Mr. Seligman the two contracts previously signed by the Union and plaintiff, on the ground that no agreement existed because the dispute over the Act II shoes had not been resolved.

The Union continued to strike plaintiff's two plants, and on November 15 plaintiff notified the Union that it considered the new contract terminated because the strike was a material breach of the contract, and that because of the Union's action it had become necessary for plaintiff to withdraw from the Board of Trade.

■ After careful consideration of the facts adduced at the hearing, the Court concludes that no contract existed between plaintiff and the Union covering plaintiff's two plants after October 31, 1962. It is true that Mr. Seligman, on behalf of the Board of Trade, approved the form contracts which were presented to him by the Union officials. However, before the I. Miller contracts were signed by the Union official and delivered to Mr. Seligman, the Union had emphatically stated that the settlement of the Act II issue was a condition precedent to the contracts becoming effective. Since Mr. Seligman was acting both for the Board of Trade and for plaintiff, plaintiff was on notice of this condition precedent. This is further pointed up by the fact that Mr. Seligman arranged for plaintiff's Vice President to come from Tennessee to New York the following morning to meet with the Union for the purpose of resolving the Act II issue. The established practice had been for each member of the Board of Trade to enter into a separate contract with the Union. Hence, at the November 5 conference the Union made an offer of new contracts to plaintiff subject to a condition precedent, and since it was not met, the subsequent signing of the contracts by plaintiff did not bring into existence a binding agreement.[2]

■■ There can be no liability for the violation of a collective bargaining agreement in the absence of an agreement. 29 U.S.C. § 185(a); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581–582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) and Procter & Gamble Independent Union of Port Ivory, N. Y. v. Procter & Gamble Mfg. Co., 312 F.2d 181, 184 (2d Cir. 1962), cert. denied 374 U.S.

2. See 3A Corbin, Contracts § 629A (1963 supplement at pg. 7):
"[A]ny one who makes an offer (or a counter offer) can expressly provide that it shall not be operative to create any power of acceptance unless and until the occurrence of a specified event. In such a case, no contract can be consummated unless that event occurs; the event is a condition precedent to the existence of a primary obligation."

830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). Here, since there was no contract, there was neither an arbitration clause nor a no strike clause. Furthermore, since it is the law of this circuit that an arbitration clause does not extend to issues arising after termination of the contract containing the clause, arbitration cannot be sought under the prior agreement which expired on October 31, 1962. Procter & Gamble, supra, 312 F.2d at 184–186.

■ It may be that by imposing its condition precedent the Union engaged in an unfair labor practice by insisting on a non-mandatory bargaining issue. See, section 8(b) (3) and 8(d), Labor Management Relations Act [29 U.S.C. § 158(b) (3) and 158(d)]; cf. N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L. Ed.2d 823 (1958). Moreover, the N. L. R. B. might find that the Union engaged in an unfair labor practice in failing to recognize the Board as a multi-employer unit with authority over the I. Miller contracts. Section 8(b) (3) Labor Management Relations Act [29 U.S.C. § 158(b) (3)]; see, Massachusetts Leather Mfrs. Assn., 112 NLRB 513, 518–519 (1955); Atlas Storage Division, P & V Atlas Industrial Center, Inc., 100 NLRB 1443 (1952). But jurisdiction as to these matters rests with the National Labor Relations Board. 29 U.S.C. §§ 159(b) and 160(a).

■ Since there was no contract, no liability attaches under section 301 of the Labor Management Relations Act and the Court must accordingly dismiss the first cause of action.

*Second Cause of Action*

■ In its second cause of action, plaintiff charges the Union with inducing and encouraging the employees of other employers "to engage in a strike and a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services for the objects of forcing and re-

quiring such other employers to cease using, selling, handling, transporting, or otherwise dealing in the products of the plaintiff, and ceasing doing business with the plaintiff causing plaintiff to suffer substantial damage by reason thereof".

This cause of action is founded on section 303 of the Labor Management Relations Act and sufficiently sets forth a claim under Fed.R.Civ.P. 8(a). The particulars sought by defendants can be obtained by discovery (Rules 26 through 37, Fed.R.Civ.P.).

■ Accordingly defendants' motion to make the second cause of action more definite and certain is denied.

*Third and Fourth Causes of Action*

The third cause of action alleges that the Union wilfully induced other labor organizations representing other employees of plaintiff to violate their collective bargaining agreements with plaintiff. The fourth cause of action alleges that the Union "as part of a plan or scheme to destroy the plaintiff's business" engaged in a number of specified activities.

Plaintiff asserts these causes of action as common law torts under New York law. It maintains that these causes of action are not within the exclusive jurisdiction of the National Labor Relations Board, and that this Court has jurisdiction of these causes of action because they are pendent to plaintiff's claims under Section 301 (which the Court is here dismissing) and Section 303, or alternatively, because diversity exists.

■ In the interest of a national labor policy, activities which are arguably protected or prohibited by the Labor Management Relations Act as amended are subject to the exclusive jurisdiction of the National Labor Relations Board. Since the Board has preemptive jurisdiction, a cause of action sounding in common law tort and resting upon such activities cannot be brought in a state or federal court. San Diego Building Trades Council Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S.Ct.

930

773, 3 L.Ed.2d 775 (1959).[3] This Court must therefore yield jurisdiction without deciding whether an activity actually is protected or prohibited whenever the activity is arguably subject to the Board's jurisdiction. San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, supra, 359 U.S. at 244–245, 79 S.Ct. 773.

■ The third and fourth causes of action appear to be predicated on activities that were part and parcel of the primary labor dispute alleged in the first cause of action. So viewed, the Court is without jurisdiction since these activities are arguably protected or prohibited by the Labor Management Relations Act and are within the exclusive jurisdiction of the National Labor Relations Board. San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, supra.[4]

Section 7 of the Labor Management Relations Act (29 U.S.C. § 157) gives employees the right to engage in concerted activities for purposes of bargaining or for their mutual aid or protection. Among these activities is the right to strike. 29 U.S.C. § 163. Thus, by alleging that the Union in the course of its strike induced other labor organiza-

tions representing plaintiff's employees to violate their collective bargaining agreements with plaintiff, the third cause of action concerns itself with activities covered by the Labor Management Relations Act. N. L. R. B. v. Local 294, I. B. T., 284 F.2d 887, 889 (2d Cir. 1960), cited with approval in Local 761, I.U.E.R. M.W. v. N. L. R. B. (the General Electric case), 366 U.S. 667, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

The activities specified in the fourth cause of action include a strike characterized as illegal, apparently on the basis of breach of contract. The Court, however, has found that no contract existed and consequently it is arguable that defendant Union and its members, by striking, were engaging in activity protected by the Labor Management Relations Act, Sections 7 and 13 (29 U.S.C. §§ 157 and 163). Several other activities alleged as part of the plan are also arguably protected as the natural concomitants of a strike; for example: picketing plaintiff's premises, halting pickups and deliveries, and inducing plaintiff's customers, other employees of plaintiff and labor organizations representing them to respect defendant's strike. See, Carrier Corp. v. N. L. R.

---

3. Actions under Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) are not preempted, Smith v. Evening News Association, 371 U.S. 195, 197–198, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), nor are actions under Section 303 of the Act (29 U.S.C. § 187) [See, Local 100 of United Ass'n of Journeymen and Apprentices v. Borden, 373 U.S. 690, at 693, 83 S.Ct. 1423, at 1425, 10 L.Ed.2d 638, note 3 (1963)] where a legal remedy is provided concurrently with the administrative remedy, both available for the identical occurrence. See, International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 243–245, 72 S.Ct. 235, 96 L.Ed. 275 (1952), and Procter & Gamble, supra, 312 F.2d, note 8 at 189; see also Sovern, Section 301 and the Primary Jurisdiction of the NLRB, 76 Harv.L.Rev. 529, 549 (1963).

4. The exclusiveness of the Board's jurisdiction over the third and fourth causes of action precludes this Court from asserting pendent jurisdiction or diversity

jurisdiction over these causes of action. But see, Morton v. Local 20, Teamsters, Chauffeurs and Helpers Union, 320 F.2d 505 (6th Cir.), cert. granted, 375 U.S. 939, 84 S.Ct. 348, 11 L.Ed.2d 270 (Dec. 9, 1963). This makes it unnecessary to decide whether the third and fourth causes of action are pendent to plaintiff's federal claims or whether diversity jurisdiction exists, and the Court expresses no view on these issues. The Court notes that plaintiff's allegation of diversity jurisdiction is defective in one respect—plaintiff has omitted to allege the state in which it has its principal place of business.

(After this opinion was handed down, the Supreme Court vacated the judgment in Morton, supra, holding that state law had been displaced by § 303 of the LMRA in private damage actions based on peaceful union secondary activities, and that the District Court erred in exercising pendent jurisdiction to award punitive damages under state law.)

B., 311 F.2d 135, 138 (2d Cir. 1962) reversed sub nom. United Steelworkers of America, A.F.L.–C.I.O. v. N. L. R. B., 84 S.Ct. 899 (March 23, 1964); N. L. R. B. v. Local 294, I. B. T., supra, 284 F.2d at 889.

The allegation of mass picketing at plaintiff's premises must also be deemed arguably protected activity incident to the strike since mass picketing stands on the same footing with other picketing as long as it does not block access to and from the struck premises or does not threaten physical violence. United Steelworkers, Local 2772 and Vulcan-Cincinnati, Inc., 137 N.L.R.B. 95, 98 (1962), and H. N. Thayer Co., 99 N.L.R.B. 1122, 1130–1131 (1952), remanded on other grounds, N. L. R. B. v. Thayer Co., 213 F.2d 748, 755–756 (1st Cir.), cert. denied, 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694 (1954). Furthermore, the allegation in subparagraph 20(b) of disparagement of plaintiff, its business and its product describes other arguably protected activity. N. L. R. B. v. National Furniture Manufacturing Co., 315 F.2d 280, 284–285 (7th Cir. 1963) and Patterson-Sargent Co., 115 N.L.R.B. 1627 (1956) distinguishing N. L. R. B. v. Local Union No. 1229, I.B.E.W. (The Jefferson Standard case), 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953).

The fourth cause of action also alleges that defendant threatened or intimidated various parties and induced "other persons" to breach their agreements with plaintiff. In view of the broad language stating the fourth cause of action and considering the difficulty in distinguishing between primary and secondary activity (See the General Electric case, supra, 366 U.S. at 673–674, 81 S.Ct. 1285), some of the activity described might also arguably support a finding of prohibited activity under Section 8(b) (4) and 8(b) (1) (A).

Plaintiff may be able to show that the activities alleged in the third and fourth causes of action are not related to the labor dispute alleged in the first cause of action, but were for some different purpose. Such a purpose is suggested by the allegation in the fourth cause of action that the Union's activities were "part of a plan or scheme to destroy the plaintiff's business". Upon such a showing, it may be that this Court would have jurisdiction with respect to some or all of the activities complained of in the third and fourth causes of action. Cf. Jody Fair, Inc. v. Dubinsky, 225 F.Supp. 695 (S.D.N.Y.1964); Ingino v. Certified Preferred, Inc. and Local 282, 222 F.Supp. 109 (E.D.N.Y. 1963). Plaintiff may be able to show some other reason why these activities are within this Court's jurisdiction. However, plaintiff has the burden of including in its complaint allegations sufficient to establish such jurisdiction, which it has not done. See Fed.R.Civ.P. 8(a) (1). Therefore, the third and fourth causes of action will be dismissed, with leave to plaintiff to amend, if it is so advised.

Finally, defendants move to dismiss the complaint on the ground that a prior action is pending in this Court between plaintiff, the defendants in this action and certain other individual and corporate defendants who are not parties here (Civ. 62–3774), and which defendants claim involve identical claims. Assuming that this defense may be raised by motion under Rule 12, see 2 Moore, Federal Practice ¶ 12.07, at 2243 (2d ed. 1962), it appears that the prior action seeks treble damages for alleged violations of the Sherman and Clayton Anti-Trust Acts going back to 1954. The two actions do not involve identical claims or identical parties, and defendants' motion to dismiss is denied.

In view of the foregoing, defendants' motions to dismiss the first, third and fourth causes of action are granted, with leave to amend as to the third and fourth causes of action within 20 days from the entry of the order herein; defendants' motion to make the second cause of action more definite and certain, and its motion to dismiss the complaint because of a prior pending action, are denied.

Settle Order on notice.