341 F.2d 482
 GENESCO, INC., Plaintiff-Appellant,
v.
JOINT COUNCIL 13, UNITED SHOE WORKERS OF AMERICA, AFL-CIO,
and Max Honig, as President, and Anthony Scimeca, as
Treasurer of Joint Council 13, United Shoe Workers of
America, AFL-CIO, Defendants-Appellees.
 No. 228, Docket 29178.
 United States Court of Appeals Second Circuit.
 Argued Dec. 2, 1964.
Decided Feb. 5, 1965.
 
 Madeline Balk, New York City (Seligman & Seligman, New York City, Edward F. Seligman, New York City, of counsel), for plaintiff-appellant.
 Marshall Rosenberg, New York City (Lieberman, Katz & Aronson, New York City, Isadore Katz, New York City, of counsel), for defendants-appellees.
 Before FRIENDLY and SMITH, Circuit Judges, and BLUMENFELD, District Judge.*
 FRIENDLY, Circuit Judge:
 
 
 1
 In a decision reported in 230 F.Supp. 923 (1964), Judge Bonsal, in the District Court for the Southern District of New York, dismissed the first, third and fourth causes of action in a complaint by Genesco, Inc. against a union representing some of its employees and two union officers. Later, in order to arrive at a final judgment appealable under 28 U.S.C. 1291, Genesco filed an amended complaint without the second cause of action, and this was dismissed in toto. Since Genesco does not appeal from the dismissal of the third and fourth causes of action, we shall state the case as if only the first had been pleaded.
 
 
 2
 Basing federal jurisdiction both on diverse citizenship and on 301(a) of the Taft-Hartley Act, 29 U.S.C. 185(a), Genesco sought damages for a strike in breach of a no-strike clause in an alleged collective bargaining contract dated as of October 31, 1962. The union moved to dismiss on the ground that by the alleged contract 'the parties agreed that any issue or dispute arising out of an alleged breach thereof shall be settled by arbitration'; the motion stated that 'the defendants specifically reserve the right, at a future time and in the appropriate forum to assert the defense that no collective bargaining agreement was in fact entered into by the defendants covering the period in question.'
 
 
 3
 After hearing the motion, the judge entered an order reciting that 'the existence of the collective bargaining agreements presents a threshold issue which must be determined before defendants' motion * * * can be decided' and directed a hearing before him 'for the sole purpose of taking testimony with respect to the existence of collective bargaining agreements' during the period of the strike. We do not understand why this was thought necessary. The court's jurisdiction was not in issue; even if the first cause of action were viewed alone, and apart from the allegation of diversity, the claim of a contract between an employer and a labor organization gave jurisdiction under 301(a) of the Taft-Hartley Act, although the plaintiff must prove the existence of a contract to obtain relief. Since the contract pleaded by the employer had an arbitration clause, the union was entitled to raise the question whether an action was not barred by its very terms, while reserving the right to deny the existence of the contract if the court decided adversely, F.R.Civ.P. 8(e).
 
 
 4
 What seems to have happened is that the judge, perhaps recognizing that the existence of an arbitration clause would normally not warrant dismissal as contrasted with a stay, see American Sugar Ref. Co. v. Anaconda,138 F.2d 765, 767 (5 Cir. 1943), aff'd, without discussion of this point,322 U.S. 42, 64 S.Ct. 863, 88 L.Ed. 1117 (1944); Swartz & Funston, Inc. v. Bricklayers Union, 319 F.2d 116 (3 Cir. 1963); Gilmour v. Wood Lathers Union, 223 F.Supp. 236, 244 (N.D.Ill.1963); but see Bonnot v. Congress of Independent Unions, 331 F.2d 355, 359 (8 Cir. 1964), treated the case in effect as if he had denied the motion and the union had proffered the alternative defense that no contract existed, which it had reserved. We should have difficulty in approving this course if it had impaired any substantial rights. Not only is it better to let a party do its own pleading, but the collapsing process may have obscured the right to a trial by jury. Whatever the right to jury trial may be when the existence of a contract giving rise to substantive rights is undenied and the dispute, arising on a request for arbitration or for a stay, is solely over the existence of an agreement to arbitrate,[1] it can scarcely be doubted that Genesco was entitled to a jury trial on the existence of the contract on which all of its rights to damages hung. However, no one made any objection to the procedure the judge propounded, and a full evidentiary hearing was had; indeed, although Genesco objects in this court to the procedure that was followed, it still has not complained of deprivation of jury trial. We therefore treat the case as if the union had denied the existence of a collective bargaining agreement and, in the absence of a jury demand, the court had found in its favor.
 
 
 5
 Genesco was a member of the Shoe Manufacturers Board of Trade of New York, Inc., an association of employers, which for many years had acted for its members in bargaining with the union through a negotiating committee on which each member was represented. On August 29, 1962, the union addressed identical letters to the members of the Board of Trade, giving notice of the termination of the current contract on October 31 and offering to meet the members at the office of the Board to negotiate a new one. At the same time it sent a copy of the notice to Benjamin Seligman, attorney for the Board of Trade, and recited its understanding that the members 'will be represented by your organization in the coming negotiations for a collective bargaining contract.'
 
 
 6
 In addition to the issues common to all the members, Genesco had a particular problem with the union, namely, whether manufacture of a shoe called 'Act II,' by its I. Miller & Sons Co. division, should continue at its plant on 11th St. in Long Island City or be transferred to its plant on 23rd St.-- an issue which concerned the union because of a radical decrease of production at the 23rd St. plant where there were many senior employees. Two union officials testified that after several unsuccessful efforts to discuss this question with Genesco's local plant manager, they had met at his suggestion with Seligman, who assured them that if agreement could be reached on other matters, Genesco would not stand a strike on the place of manufacture of Act II; Seligman denied this, and the judge did not resolve the conflict. Upon the expiration of the contracts on October 31, the union struck all members of the Board of Trade.
 
 
 7
 A day or so later the union informed Seligman of a settlement with another group of shoe manufacturers. On November 5, the Board of Trade sent the union a telegram saying that this settlement was acceptable and 'we will meet with you to work out contract language'; the union was asked to have the employees back at work on November 6.
 
 
 8
 Later on November 5 officers of the union appeared at Seligman's law office with a number of unsigned contracts. The form, providing for a two-year extension of the basic agreement with various modifications, was entitled 'Memorandum of Understanding * * * between ........ on behalf of its members and Joint Council No. 13, USWA, AFL-CIO,' and concluded with a blank subscribed 'Firm' and a line for an officer's signature, and 'Joint Council 13, United Shoe Workers of America, AFL-CIO, By ...............' Whatever ambiguity may have existed in the form, the practice was to have contracts executed individually by each member firm. Seligman read the form and pronounced it acceptable to the Board of Trade. As the union officers began to sign the contracts, they informed him that none would be entered into with the two I. Miller factories unless the Act II issue was settled as they desired. Seligman insisted that the union was already committed to Genesco; at the same time, however, he arranged for a vice-president to come from its Nashville headquarters for a conference in New York the following morning. The union officers left the signed contracts with Seligman. They testified he promised these would not be presented to Genesco for signature; he denied this. Although the judge made no specific finding as to such a promise, we gather from his decision that he found the union had made quite clear its unwillingness to contract unless the Act II question was settled. The conference on November 6 proved fruitless. On that day the employees of the other Board of Trade members returned to work, but I. Miller's did not. On November 6 also I. Miller sent a long telegram to the union, taking the position that a contract had been made and that the continued strike was in breach of its no-strike clause. The next day the Board of Trade despatched a telegram along the same lines, and Seligman transmitted to the union the contracts signed by the employers, including the two with I. Miller. The union promptly returned the latter.
 
 
 9
 On November 15 Genesco notified the union that it considered the contracts terminated by the union's material breach and that it had been compelled by the union's action to withdraw from the Board of Trade. Later it filed a charge with the National Labor Relations Board, whose Regional Director, on Feb. 28, 1963, issued a complaint alleging, inter alia, that the union had refused to sign a collective bargaining contract with Genesco to which it had agreed and by this and other acts had violated 8(b)(1)(A), 8(b)(1)(B), and 8(b)(3) of the National Labor Relations Act. In April, the Regional Director approved a settlement, consented to by the union and the employer, wherein the union, disclaiming any admission it had violated the Act, agreed that it would not refuse to bargain with the Board of Trade by striking to compel I. Miller 'to modify any collective bargaining agreements, during the effective term thereof, by requiring the transfer' of the place of manufacture of the Act II shoes, that it would not strike, without compliance with 8(d) of the National Labor Relations Act, 'to compel I. Miller to modify any collective bargaining agreements, during the effective term thereof; by requiring such transfer, and that it would not insist on a release from liability as a condition to entering into a collective bargaining agreement with I. Miller.
 
 
 10
 If the issue is to be determined by applying ordinary principles of contract law, we would conclude that no agreement between the union and Genesco was reached. Certainly none was made by the despatch of the Board of Trade's telegram on November 5, which indicated agreement in principle but proposed a meeting to work out contract language. See Lees v. Akshun Mfg. Co., 205 F.2d 577, 578 (7 Cir. 1953); Ryan v. Schott, 109 Ohio App. 317, 159 N.E.2d 907 (1953). A closer question would be whether contracts were made when Seligman pronounced the language satisfactory, just before the union officers reiterated their demand as to Act II, since the member firms had already approved the substance and Seligman had authority to approve the form. Cf. NLRB v. Winchester Electronics, Inc., 295 F.2d 288, 290-291 (2 Cir. 1961). That the parties plan later to sign an agreement does not preclude prior formation of the contract by signifying assent to an unsigned paper; the issue is one of intention, Mississippi & Dominion S.S. Co. v. Swift, 86 Me. 248, 29 A. 1063 (1894); Restatement (Second), Contracts 26 (Tent. Draft No. 1, 1964), 1 Corbin, Contracts 30 (1963); Llewellyn, On Our Case-Law of Contract: Offer and Acceptance, I, 48 Yale L.J. 1, 14 (1938). Considering the importance attached to signed contracts in the field of collective bargaining, H. J. Heinz Co. v. NLRB, 311 U.S. 514, 523-526, 61 S.Ct. 320, 85 L.Ed. 309 (1941), and 8(d) of the Act, 29 U.S.C. 158(d), the long-standing practice here of having contracts signed by the individual employers, the fact that the instant contracts were to be an extension and modification of contracts so signed, and the doubtful enforceability of a two-year oral contract,[2] we think no one really believed that the parties would be bound until the contracts were fully executed and delivered. This is so even though the employers asked that the men return to work before these steps were completed. Once this is decided, it is clear that delivery to Seligman of the forms signed by the union officers on condition that the contracts with Genesco should not be consummated until resolution of the Act II issue, did not permit formation of a contract unless the condition was met. See Dickey v. Hurd, 33 F.2d 415, 419 (1 Cir.), cert. denied, 280 U.S. 601, 50 S.Ct. 82, 74 L.Ed. 646 (1929); Detroit Football Co. v. Robinson, 186 F.Supp. 933 (E.D.La.), aff'd on other grounds, 283 F.2d 657 (5 Cir. 1960); 1 Williston, Contracts 77 (3d ed. Jaeger 1957); 3A Corbin, Contracts 629A (1964 Supp.).
 
 
 11
 Genesco advances the interesting contention that ordinary contract principles are not the proper criterion in the light of Mr. Justice Douglas' statement in Textile Workers' Union v. Lincoln Mills, 353 U.S. 448, 456-457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972, 980 (1957), 'that the substantive law to apply in suits under 301(a) is federal law, which the courts must fashion from the policy of our national labor laws.' It argues that when a union's refusal to sign a contract would constitute an unfair labor practice, compare Chicago Stevedoring Co., 125 N.L.R.B. 61 (1959), modified sub nom. NLRB v. Local 19, Int'l Bhd. of Longshoremen, 7 Cir., 286 F.2d 661, cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), courts should hold that a contract exists, no matter how clearly a party has indicated it does not intend to be bound until a formal contract is signed. A court applying federal labor contract law would thus regard as done what it thinks the Labor Board would think ought to be done or, at least, what it thinks the Labor Board would order to be done. The justification for this, in addition to the authority of the Supreme Court's statement, would lie in reinforcing the principles of bargaining developed by the Board and in avoiding duplicitous judicial and administrative proceedings-- the latter of which the aggrieved party could never compel and which might be impossible in some instances due to self-imposed limitations on the Board's jurisdiction, 14(c)(1).
 
 
 12
 The argument ought not be rejected merely on a mechanical view that federal power attaches only when a contract has been made, so that the 'federal law' doctrine expounded in Lincoln Mills and enforced in Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), can apply only to interpretation of collective bargaining contracts as contrasted with their formation. Yet the distinction has force as a point of substance, although it has none as one of federal power. Where the parties have reached an agreement embodied in a signed contract, one of the prime aims of national labor policy, it is altogether reasonable that courts or arbitrators should hold them to it even though they may have to pass on the same conduct as the NLRB might have to consider in the trial on an unfair labor practice complaint; the doctrine of San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), has been shunted aside to that extent. See Smith v. Evening News Ass'n, 371 U.S. 195, 196-198, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Carey v. General Elec. Co., 315 F.2d 499, 508-511 (2 Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964). Utilizing national labor policy as a new source of law to govern the formation of labor contracts raises more serious problems. The Third Circuit, sitting in banc, divided evenly on the issue whether national labor policy should be deemed to nullify the doctrine of Pym v. Campbell, El. & Bl. 370, 374, 119 Eng.Rep. 903, 905 (1856), that 'evidence to show that there is not an agreement at all is admissible' despite the parol evidence rule. Lewis v. Mears, 297 F.2d 101 (3 Cir.), cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962). See also Chief Judge Sobeloff's dissent in Lewis v. Lowry, 295 F.2d 197, 201-202 (4 Cir. 1961), cert. denied, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962). But an affirmative holding on that issue would have a much readier application, and would entail far less danger of judicial and administrative conflict, than a general principle that a court would consider a contract to have been made whenever it believes that failure to execute the contract is an unfair labor practice. Such a principle would place the courts-- state as well as federal-- in the center of the very area, the definition of unfair labor practices, which Congress staked out for the Labor Board; moreover it would mean that the courts would be forced to decree contract formation, and this with retroactive effect, in all such cases, although the Board, with the wide choice of remedies given by 10(c) of the Act, might think a lesser sanction appropriate. Evidently, as its action in this very matter may bear witness, the Board does not always direct the execution of a contract even when it considers that a party ought to have signed; the difference between the settlement of the unfair labor practice complaint approved in this case and an order to sign a contract as of November 5, 1962, is crucial to the very controversy at issue.
 
 
 13
 The problem bears some resemblance to the reception of principles of equity into contract law. The common law courts did not hurry to accept equity principles but allowed some time for the chancellor to work out his doctrines, so that a fair degree of certainty would exist; and even then they left equitable remedies to the chancery. Similar restraint seems desirable in integrating principles of national labor policy into labor contract law; courts must be careful not to go further than the agency to which Congress has given prime responsibility. It suffices for decision here that we are by no means certain that the Board would find that the union's refusal to sign the contracts with Genesco was an unfair labor practice, and still less certain that the Board would have directed it to sign them as of November 5, 1962.[3]
 
 
 14
 The union's refusal to acknowledge itself as bound to an extension agreement with Genesco might be deemed an unfair labor practice on two scores. One would be that the place of manufacture of the Act II shoe was not an issue relating 'to wages, hours, and other terms and conditions of employment' within 8(d), on which alone the union could permissibly bargain to an impasse. Until very recently we should have thought that was rather clearly so. See NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (2 Cir. 1961) and other cases cited in Mr. Justice Stewart's concurring opinion in Fibreboard Paper Prods. Corp. v. NLRB, 85 S.Ct. 398 n. 7 (1964). But, in Mr. Justice Stewart's phrase, the majority opinion in Fibreboard, although not the actual decision, 'radiates implications of such disturbing breadth,' 85 S.Ct. at 406, that we no longer feel certain about this.
 
 
 15
 The other point, more strongly pressed by Genesco and apparently the sole subject of the General Counsel's complaint, is that the union could not lawfully withdraw from multi-employer bargaining by a last minute particularized demand on one employer. See Retail Associates, Inc., 120 N.L.R.B. 388 (1958). Compare Kasco Trucking Co., 133 N.L.R.B. 627 (1960). There surely can be no general principle that multi-employer bargaining prevents either side from bargaining about or even from insisting on a solution of a mandatory subject peculiar to a particular plant;[4] we should suppose that any such principle would very likely result in curtailment or abandonment of a practice deemed important to industrial peace. See NLRB v. Truck Drivers Local 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). The considerations and authorities pertinent to this issue have just been exceedingly well reviewed by Judge McGowan in Retail Clerks Union No. 1550 v. NLRB, 117 U.S.App.D.C. 336, 330 F.2d 210, 216, cert. denied, 379 U.S. 828, 85 S.Ct. 59, 13 L.Ed.2d 39 (1964). Dealing with an employer's insistence on separate treatment of a particular bargainable issue, he said that where the departure from uniformity 'is not surreptitious, or accompanied by a refusal to bargain on an individual basis, the Board may well conclude that the accused employer has not failed to meet the standards which Congress has set for him in treating with his employees.' Multi-employer bargaining does not altogether preclude demand for specialized treatment of special problems; what is required, if an employer or a union is unwilling to be bound by a general settlement, is that the particularized demand be made early, unequivocally and persistently. See NLRB v. Jeffries Banknote Co., 9 Cir., 281 F.2d 893 (1960). If the testimony of the union officers here is credited, its conduct met that test; we are by no means certain that if the complaint had gone to hearing, the Board would not have concluded that the union had acted properly and that Genesco had lulled it into a false security that the Act II issue would be settled as it wished.[5] And, both on this point and on the mandatorily bargainable character of the issue, we are even less confident that the Board would have found the union's conduct to be such that it would have directed signature of the contract as of a date preceding the strike, with the possibly serious financial consequences to the union flowing therefrom.
 
 
 16
 We thus do not find the radiations 'from the policy of our national labor laws' giving such clear signals in this case as to justify our holding the union to be bound by a contract which it would not be considered to have made on ordinary principles of contract law.
 
 
 17
 Affirmed.
 
 
 
 *
 Sitting by designation
 
 
 [1]
 This question would not be free from difficulty. Consideration might have to be given to the right to jury trial under the Federal Arbitration Act, 9 U.S.C. 1-14, compare 3 (stays) with 4 (enforcement); the impact of 1's exclusion of employment contracts, see Local 205, United Elec. Workers v. General Elec. Co., 233 F.2d 85, 98-100 (1 Cir. 1956); 301 as a source of law for labor arbitration, General Elec. Co. v. Local 205, United Elec. Workers, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957) (affirming prior case on other grounds); and constitutional demands, compare Finsilver, Still & Moss v. Goldberg, Maas & Co., 253 N.Y. 382, 171 N.E. 579, 69 A.L.R. 809 (1930) with Lehigh Structural Steel Co. v. Rust Eng'r Co., 61 App.D.C. 224, 59 F.2d 1038, 1039 (1932)
 
 
 [2]
 New York clearly regards personal employment contracts as subject to N.Y. Personal Property Law, McKinney's Consol.Laws, c. 41, 31(1), voiding oral agreements not to be performed within one year. Badger v. Scobell Chem. Co., 221 App.Div. 490, 224 N.Y.S. 648 (1927). The present collective bargaining establishes on both sides obligations continuing for two years. Possibilities such as the termination of business within a year seemingly would not be taken to avoid the statute. See Zupan v. Brumberg, 2 N.Y.2d 547, 550, 161 N.Y.S.2d 428, 429-430, 141 N.E.2d 819 (1957)
 
 
 [3]
 A different case would be presented if the party claiming that refusal to enter into a contract was an unfair labor practice had obtained a valid Board order directing the refractory party to sign a contract covering the critical date. Cf. Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 497-500, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958)
 
 
 [4]
 As to an employer the right of insistence may be overcome by a majority control clause. See NLRB v. Jeffries Banknote Co., 281 F.2d 893 (9 Cir. 1960)
 
 
 [5]
 In this portion of the opinion we assume, although only arguendo, that the Act II issue was a proper subject for mandatory bargaining