In the Matter of the Arbitrations Between GLOBE SEAWAYS, INC., and NATIONAL MARINE ENGINEERS' BENEFICIAL ASSOCIATION, et al.

No. 70-Civ. 2725.

United States District Court,
S. D. New York.

Jan. 27, 1971.

Scribner, Glanstein & Klein, New York City, for plaintiff National Marine Engineers Beneficial Assn., by David Scribner, New York City, of counsel.

Surrey, Karasik, Greene & Seham, New York City, for defendants Globe Seaways, Inc., and Sea Liberties, Inc., by Martin C. Seham, New York City, of counsel.

## MEMORANDUM

CROAKE, District Judge.

This is a motion to confirm a series of arbitration awards. It was brought on under 9 U.S.C. §§ 6 and 9, after having originally been brought pursuant to N.Y.C.P.L.R. 7510 (McKinney 1963) by petition in the New York State Supreme Court, in a special proceeding under C.P.L.R. Article 4, §§ 401–411. Defendants removed it to this court under 28 U.S.C. § 1441; the court possesses jurisdiction under 29 U.S.C. § 185(a).

The parties to this proceeding and motion are the petitioner-movant, National Marine Engineers' Beneficial Association ("MEBA"), a "union" representing licensed marine engineers,[1] and respondents Globe Seaways, Inc. and Sea Liberties, Inc., one of which owns one tanker, and one a dry cargo vessel ("respondents").

Other entities which are not parties are Marine Overseas Corp., which is operating agent for respondents and for six similarly constituted corporations ("MOC"); the American Maritime Association, a trade organization which conducts labor negotiations as respondents' bargaining agent ("AMA"), and the Seafarers' International Union, which represents unlicensed seamen ("SIU").

This dispute has its roots in a jurisdictional struggle between MEBA and SUI regarding the status of "cadets," or unlicensed apprentice engineers, on SIU-contracted vessels. That question was originally determined adversely to MEBA by the AFL–CIO Internal Disputes Plan, after a complaint had been lodged by SIU.

Afterwards, on June 15, 1969, the contracts for engineering services between District 1 of MEBA and the member companies of AMA, including respondents, expired. On June 26 and 27, 1969, MEBA and AMA signed "Memoranda of Understanding," which provided that new tanker and dry cargo contracts would be signed by MEBA and the owners. The terms of the new contracts were detailed, either in the memoranda themselves or by reference to other documents, and provisions were inserted stating that "this New Contract shall be deemed to have become final and binding upon the parties hereto only upon [notification by MEBA of ratification by its membership]." MEBA apparently also reserved the right to terminate the memorandum and agreement on 24 hours' notice.

Subsequently MEBA submitted form tanker contracts to the AMA members, but they included an additional letter relating to cadets. Respondents stated their willingness to sign the contracts without the letter, but refused to incorporate the letter, for fear of reviving the difficulties with SIU. MEBA then gave 24 hours' notice and "struck" the two ships owned by respondents.[2]

[1]. MEBA has been held by the National Labor Relations Board to be an association of supervisory personnel for some National Labor Relations Act purposes.

[2]. MEBA apparently denies that a strike in fact took place; it is not necessary at this juncture to determine whether or not the activities engaged in amounted to a "strike."

After respondents' ships had remained idle for several days, non-MEBA engineers were procured to operate them. MEBA claims that its engineers were also solicited by respondents, but has shown only one incident in which a night engineer was solicited by an agent of respondents. All MEBA engineers, including that individual, have not been allowed to board either of respondents' ships, from the time of the "strike" to the present.

After respondents began operating their ships with non-union engineers, MEBA invoked the arbitration clauses in the "contracts" which it then asserted had been entered into by the parties, and presented the wage claims of certain engineers who had been refused permission to board the ships. Respondents did not participate, and the awards herein sought to be confirmed were handed down.

The central issue is whether valid contracts were in fact entered into. If there had never been any contracts, the arbitrator was without power, and his awards are nullities. Procter & Gamble Ind. U. v. Procter & Gamble Mfg. Co., 312 F.2d 181, 184–186 (2d Cir. 1962), cert. den., 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). ·

MEBA presents two arguments for its position that binding contracts were in fact entered into on June 26 and 27, 1969. It first asserts that the Memoranda signed on those dates are legally sufficient as contracts, without more. In this regard it necessarily argues that all material terms of the agreements were included, and that the signature of the AMA was sufficient to bind respondents.

MEBA next asserts that, even if the Memoranda are held to be insufficient without more, the actions of respondents in the period after the signing of the contracts demonstrate that they believed that new contracts had been entered into, and initiated their implementation. The actions cited are the payment of wages and certain benefits, which had already been owing, at "new contract"

rates, and the references to "new contracts" in certain letters.

The position of respondents is that no contracts were ever arrived at. They further assert that, if contracts had been arrived at, they ceased to be in force by reason of the repudiation by MEBA. Respondents also attack irregularities in the arbitration proceedings themselves.

It is the opinion of this court that effective arbitration clauses were not in existence at the time the arbitration awards herein sought to be enforced were handed down. The court finds that the Memoranda of June 26 and 27, 1969 were actually mere "agreements to agree," which later proved impossible to enforce. That the parties recognized their status is evidenced by the respondents' refusal to sign the actual contracts, and MEBA's invocation of the termination clause. The parties obviously regarded the "cadet problem" to be material, and failed to reach a "meeting of the minds" on this issue. Genesco, Inc. v. Joint Council 13, United Shoe Wkrs. of America, 341 F.2d 482 (2d Cir. 1965).

The evidence cited as indicating a contemporary belief in the existence of binding contracts is unpersuasive. The wages and benefits paid at "new contract" rates are at most *de minimis*, and are probably the result either of a spirit of accommodation, or of clerical oversight in not checking MEBA's computations. The language in the letters noted, which refers to "new contracts," is ambiguous, since the Memoranda apparently refer both to themselves and to successor documents as the "new contracts." In any event, not all letters were written by respondents. The most these letters could indicate is confusion, not knowledge, among the parties as to their present status.

Even if the Memoranda be read as contracts, the arbitration clauses could not have been available at the time they were sought to be invoked. For the "strike" which had occurred previously had been in violation of the same arbitration clauses. MEBA cannot be al-

lowed to compel arbitration of those disputes which it wishes to arbitrate, and "strike" over those disputes which it does not.

In light of this determination, it is unnecessary to decide whether or not the arbitration proceedings were conducted properly and the awards were within the scope of the arbitration.

The petitions are denied; the arbitration awards are vacated.

So ordered.