344

Samuel M. KAYNARD, Regional Director of Region 29 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, and Local 504, Transport Workers Union of America, AFL–CIO, Respondents.

No. 69 Civ. 1200.

United States District Court
E. D. New York.

Nov. 5, 1969.

Lawrence M. Monat, Brooklyn, N. Y., for petitioner.

O'Donnell & Schwartz, New York City, for respondents; John F. O'Donnell, New York City, of counsel.

Miller & Seeger, New York City, for Triangle Maintenance Corp.; Seymour Miller, New York City, of counsel.

## MEMORANDUM

WEINSTEIN, District Judge.

### I

The Regional Director of the National Labor Relations Board (N. L. R. B.) seeks a temporary injunction against the Transport Workers Union of America, AFL-CIO, and Local 504, Transport Workers Union of America, AFL-CIO (T.W.U.) pending disposition of charges filed by Triangle Maintenance Corporation (Triangle). 29 U.S.C. § 160(l). T.W.U. is alleged to have engaged in unfair labor practices by engaging in a proscribed strike against Triangle in connection with a jurisdictional dispute. 29 U.S.C. § 158(b) (4) (D).

The quarrel arises from an attempt by some sixty-nine cleaning workers represented by T.W.U. to retain jobs they have had for some years; Triangle substituted a new crew for these workers. For the reasons indicated below, the injunction must be denied.

### II

When the International Arrivals Building and the Control Tower at John F. Kennedy Airport were opened in 1959 the New York Port Authority awarded the cleaning contract to Allied Aviation Service Company (Allied). Since Allied had been doing other cleaning work at the Airport with employees covered by a collective bargaining agreement with T.W.U., Allied assigned the work to T.W.U. members. In 1961 the cleaning contract was shifted by the Port Authority to American Building Maintenance Company of California; it retained the former employees of Allied and assumed the T.W.U.-Allied collective bargaining

agreement. Allied was again awarded the contract in 1966; it retained the same employees and union agreement. Both the T.W.U.-Allied agreement and the Allied contract with the Port Authority were due to expire at 12:00 midnight of July 31, 1969. By that time some of the sixty-nine cleaning workers involved would have been working at the locations in question for as much as ten years, and they had built up substantial seniority and other rights.

Triangle had, during at least some of these ten years, been doing cleaning work at other locations in the airport. It had a contract with Local 32B of the Building Service Employees International Union (32B).

In the spring of 1969 Triangle bid for the work at the International Arrivals Building and the Control Tower. Triangle reasonably interpreted its 32B agreement as covering any work it obtained at the airport. T.W.U., however, took the position that Triangle would have to keep Allied's sixty-nine men and negotiate a new agreement with T.W.U., their union representative, for the two locations. Thus, were Triangle to obtain the contract, it faced being enmeshed in an inter-union dispute between T.W.U. and 32B.

On July 24 it became known that the Port Authority had granted the contract to Triangle. Triangle began advertising for workers and planning the transfer of a few of its employees from other locations at the airport so that it could assign a new work crew to the International Arrivals and Control Tower locations shortly after midnight of July 31. It contemplated bringing in these workers under the 32B agreement.

To Triangle's surprise, at 2:30 P. M. on July 31, it was informed by 32B that the union laid no claim to the work, that the men on the job should be retained, and that an agreement with T.W.U. should be sought. T.W.U. and 32B had amicably resolved their incipient dispute by having 32B bow out. Nevertheless, Triangle refused to discuss the matter

with T.W.U. and continued to plan to bring in a new crew that night. One of the chief factors that motivated Triangle not to try to reach an agreement with T.W.U. was that it had bid on the basis of 32B wage rates and retaining Allied's senior employees and T.W.U. representation would have increased its labor costs beyond those it had foreseen.

Thirty-one of the sixty-nine Allied employees were scheduled to begin work a half hour before midnight on July 31. Upon arrival they were informed by T.W.U. officials that Triangle had not hired them and they were advised to strike. Picketing began at midnight. T.W.U's dual intention in encouraging picketing was, first, to force Triangle not to terminate the sixty-nine workers' employment at these sites and, second, to force Triangle to bargain with T.W.U. as representative of these workers. Triangle's new employees passed the picket lines within the hour and the dispute took on its present posture.

The N.L.R.B. Regional Director agrees that the legality of the picketing for the purpose of granting an injunction is to be determined as of the early morning hours of August 1. It is not relevant, therefore, that at about 10:00 P. M. on August 1—some twenty-two hours after picketing began—Triangle entered into an agreement with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 732 (Teamsters) as the exclusive bargaining agent for cleaning workers at the two locations. Accordingly, the Court refused to hear evidence offered by T.W.U. as to the lack of bona fides of that Triangle-Teamsters agreement. An injunction could not, therefore, be granted on the theory that Triangle was caught in a jurisdictional dispute between T.W.U. and the Teamsters.

## III

Statutory language relied upon by the N.L.R.B. might seem broad enough to cover as a jurisdictional dispute a disagreement between a "class" of workers represented by a union, who have long held certain jobs, and an employer who brings in a "class" of new workers to replace them. The provision, section 8(b) (4) (D) of the National Labor Relations Act (Act), reads as follows:

8(b) It shall be an unfair labor practice *for a labor organization or its agents*—

\* \* \*

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\* \* \*

(D) forcing or requiring any employer to assign particular work to employees in a *particular labor organization* or in a particular trade, craft, or *class rather than to employees in another labor organization* or in another trade, craft, *or class*, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work. (Emphasis supplied.)

The decisions of the Supreme Court, however, have made it clear that subsection (D) is primarily intended to aid "employers in the position of neutrals between contending parties", it protects "the employer only from union pressures designed to involve him in disputes not his own." National Woodwork Manufacturers v. N.L.R.B., 386 U.S. 612, 625, 87 S.Ct. 1250, 1258, 18 L.Ed.2d 357 (1967). A reading of subsection (D) with section 10(k) of the Act has led the Supreme Court to conclude that the two provisions place an obligation on the

N.L.R.B. to resolve what are truly jurisdictional disputes, usually between unions. N.L.R.B. v. Radio & T.B.E. Union, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961). Subsection (D) and section 10(k) were designed to interact and to cover the situation where "rival unions are unable to settle such disputes themselves." N.L.R.B. v. Radio & T.B.E. Union, 364 U.S. 573, 580, 81 S.Ct. 330, 335 (1961). *But cf.* Local 1291, Int'l Longshoremen's Association, 152 NLRB 676 (1965) (a disclaimer was ineffective because the disclaiming union's men would, under their contract, be paid for the disputed work in any event). These are the classic jurisdictional disputes Congress was most concerned about when these provisions were adopted. Penello v. Local Union No. 59, Sheet Metal Workers Int'l Ass'n., 195 F.Supp. 458 (D.Del.1961).

This is not to say that the presence of two unions is essential to the characterization of a dispute as jurisdictional under the statute. So, for example, the N.L.R.B. has termed jurisdictional a union demand for jobs which have been and are held by a group of employees belonging to ·no labor organization. *See, e. g.,* International Brotherhood of Electrical Workers, AFL-CIO and its Local 639, 138 NLRB 689 (1962); International Longshoremen's Association, AFL-CIO, Local 1248, 151 NLRB 312, 317 (1965). And statutory protection has· been afforded the perambulating employer whose transfers of its own non-union employees to changing construction sites creates problems as these men enter spheres of influence staked out by unions whose members have not theretofore held the specific jobs. *See, e. g.,* International Brotherhood of Electrical Workers, AFL–CIO, Local Union No. 453, 158 NLRB 426 (1966) (jobs on new construction site); Local 87, International Association of Heat and Frost Insulators and Asbestos Workers, AFL–CIO, 163 NLRB (1967) (same). These are cases where a union seeks to obtain jobs its members have not held.

The statutory language may not be extended to cover traditional forms of economic disputes between an employer and union attempting to retain specific jobs historically held by particular employees. 29 U.S.C. § 163 ("Nothing * * * except as specifically provided * * * shall be construed * * * to interfere with * * * the right to strike."). Subsection (D) "is not meant to reach conduct by a union seeking to compel reemployment of members who have been discharged and replaced as the result of business changes by an employer." Rubinstein Bagels v. Laskowitz, 268 F.Supp. 920, 922 (S.D.N.Y.1967). *See also* The Metallic Lathers Union, Local 46, 156 NLRB 749 (1966); Teamsters Union (Safeway Stores), 134 NLRB 1320, 49 LRRM 1343, 1344 (1961); Int'l Brotherhood of Electrical Workers, Local 292 (Franklin Broadcasting Company), 126 NLRB 1212 (1960); Metal Workers (Albers Milling), 90 NLRB 1015, 26 LRRM 1320, 1321 (1950); Atleson, The NLRB and Jurisdictional Disputes: The Aftermath of CBS, 53 Geo.L.J. 93, 103 (1964). It matters not, under subsection (D), that a new subcontractor is substituted at a permanent job site so long as the newcomer does not bring with it new entan'gling union relationships which conflict with those of the predecessor.

■ There is no need to face the puzzling question of whether a new subcontractor may be a "successor" in the technical sense of that word and whether it therefore may be obligated under some circumstances to assume its predecessor's union obligations. *Cf.* John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 548, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (arbitration); McGuire v. Humble Oil, 355 F.2d 352, 357 (2d Cir.), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966) (Wiley doctrine of successor not applicable in two-union situation); N.L.R.B. v. Colten, 105 F.2d 179 (6th Cir. 1939) (partnership termination). What is clear is that a union, whose members are presently employed at a specific site on jobs which will continue to be filled,

may properly seek by means otherwise lawful to retain those workers in those current jobs, at least so long as there is no other union claiming those jobs. *Cf.* Tri State Maintenance Corporation v. N.L.R.B., 132 U.S.App.D.C. 368, 408 F.2d 171, 173 (D.C.Cir. 1968) (new cleaning contract holder may not discriminate against employees of former contractor as a group)

### IV

It would be hard to visualize a situation less aptly characterized as a jurisdictional dispute than the one before us. The beneficiary of the cleaning services, and in a sense the ultimate employer both before and after it changed subcontractors, was the Port Authority. For ten years the same workers had been cleaning the same Port Authority premises. The new subcontractor underbid and received the cleaning award because it planned to install new workers to do the Port Authority cleaning at lower wages. This case thus presents a traditional economic struggle between the "employing industry" (N.L.R.B. v. Colten, 105 F.2d 179, 183 (6th Cir. 1939)) intent on cutting costs and employees determined not to lose their jobs. This kind of disagreement has been the basis for strikes since workers began destroying labor saving machinery at the beginning of the industrial revolution. While it may be economically sound, from the employer's point of view, to utilize new and possibly more efficient work crews, the employer's practical power to retrench has not been enhanced by any statutory prohibition against workers' picketing. It was not illegal for the displaced Allied workers to try to hold on to their jobs by picketing; the fact that they turned to their union for support or that the union supported the strike does not transmute a bona fide economic quarrel into a proscribed jurisdictional dispute.

As of 12:01 on the morning of August 1, 1969, when picketing began, the employer was not required to bring in new workers. Whatever Triangle had done

to hire new workers as individuals did not create a jurisdictional dispute under subsection (D).

Since there is no reasonable cause to believe that T.W.U. has engaged in the unfair labor practices charged, the petition must be, and is, dismissed. On reargument, this decision is adhered to.