**ACMAT CORPORATION**

v.

**INTERNATIONAL UNION OF OPERAT-
ING ENGINEERS, Operating Engineers
Local 478, International Association of
Bridge, Structural and Ornamental Iron
Workers, and Iron Workers Local 15
and 424.**

Civ. No. H–74–265.

United States District Court,
D. Connecticut.

Dec. 14, 1977.

Robert Frazer, East Hartford, Conn., McNeill Stokes, Herman L. Fussell, Atlanta, Ga., for plaintiff.

Norman Zolot, Hamden, Conn., John A. Arcudi, Bridgeport, Conn., James O'Connor Shea, New Haven, Conn., Victor M. Ferrante, Bridgeport, Conn., for defendants.

## RULING ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

Plaintiff began this action on September 3, 1974, seeking injunctive relief and damages against the defendant unions based on allegations that the defendants had caused a work stoppage by striking over a jurisdictional dispute in violation of the terms of the Plan for Settlement of Jurisdictional Disputes. (All of the building and contractors unions and many employers' associations had agreed on behalf of their members to be bound by the "Plan").[1] In addition it claimed a violation by the defendants of § 8(b)(4)(D) of the Act, 29 U.S.C. § 158(b)(4)(D). Jurisdiction was predicated on §§ 301 and 303 of the Labor Management Relations Act, as amended (29 U.S.C. §§ 185, 187). On the basis of an affidavit supporting the complaint, a temporary restraining order was issued the same day, and the court also issued an order to show cause returnable on September 12, 1974.[2]

---

1. The Plan for Settlement of Jurisdictional Disputes in the Construction Industry is an agreement signed by the Building and Construction Trades Department of the AFL–CIO and 10 employers' associations, the terms of which are commonly incorporated in collective bargaining agreements. Its aim is to provide a private mechanism for deciding jurisdictional disputes in an industry where union jurisdictions frequently overlap, and thereby to prevent costly work stoppages. One commentator wrote in 1960 that this mechanism had "been remarkably successful in eliminating work stoppages resulting from these disputes and, consequent-

ly, in relieving the [NLRB] of a burdensome share of these problems." Note, *Work-Assignment Disputes Under the National Labor Relations Act*, 73 Harv.L.Rev. 1150, 1163 (1960) (footnote omitted).

2. The temporary restraining order was granted in the belief that the strike could properly be enjoined under *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). An affidavit filed by plaintiff at that time represented that all the parties were bound by the rules and regulations of the Impartial Jurisdictional Disputes Board. Affidavit of Bryan Marsh, undated, at 4. The

Because the unions' jurisdictional dispute was resolved before that date and the work was being done, no hearing was held. Although the plaintiff has withdrawn its claim for injunctive relief, it still pursues its claims for damages.

ACMAT is a Connecticut corporation whose business is that of a mechanical construction contractor. It is suing three labor union locals, 478 of the Operating Engineers, 15 and 424 of the Bridge, Structural and Ornamental Iron Workers, and their respective International Unions. The plaintiff seeks damages for its delay in completing a subcontract for a general contractor, delay allegedly caused by the defendants' conduct in holding up its work during a dispute as to who was entitled to it.

All defendants have moved to dismiss the action, and also for summary judgment. These dual motions presented simultaneously result in a merger of the two into the motions for summary judgment here. The parties have presented affidavits in support of both. Rule 12(b), Fed.R.Civ.P. Thus the plaintiff's claim is not to be tested on the "bare bones" of its allegations, cf. *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505 (5th Cir. 1971), to determine whether it "can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Rather, the test to be applied is whether on all of the material facts not genuinely in dispute the defendants are entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; cf. *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317 (2d Cir. 1975). To reach a clearer understanding of the issues thus raised, a description of the circumstances which gave rise to the plaintiff's claim is advisable.

## The Situation

The plaintiff, ACMAT Corporation, was the subcontractor for all of the mechanical work to be done in the construction of the Hartford Fire Insurance Company office building in Hartford in the summer of 1974. In the performance of its subcontract, AC-MAT required a tower crane to lift mechanical equipment to the roof of the building. To perform that work, it took steps to obtain an operable 140-ton crane at the job site. An unassembled tower crane was leased from Lee Crane Service of Boston. During its assembly and afterwards, this crane was to be operated by two men on Lee Crane's payroll, an "operator" and an "oiler." Assembly of the large crane required the use of a 30-ton "helper" crane, which ACMAT leased along with a separate crew, from S. G. Marino Crane Service of Middletown. ACMAT had subcontracted the job of assembling the large crane to Christie Rigging and Trucking Company of Glastonbury.

By August 19, 1974, the large crane had arrived at the job site in an unassembled condition, on five flat-bed trailer trucks. In anticipation of the assembly job, ACMAT arranged to have the crane assembled by a composite crew of steamfitters and iron workers. It initiated a discussion with the iron workers and the steamfitters through the business agents of their respective local unions. The Iron Workers and Steamfitters representatives acquiesced in ACMAT's assignment of the work, but no representative of the Operating Engineers was a party to this discussion. ACMAT had a collective bargaining agreement with the Steamfitters, but not with the Iron Workers or Operating Engineers. On August 19, members of all three unions were present for the purpose of assembling the crane; but that was not done. A dispute arose among the members of the three craft unions. The

court undertook to communicate with the defendants before issuing the temporary restraining order, but their attorney was not available to appear on September 3 or at any time during that week. A representative of Operating Engineers Local 478 was informed of the proceedings but declined to appear. Hearing in Chambers, September 3, 1974, Tr. at 1–2. Examination of a more fully developed record has revealed that the strike did not constitute a breach of any contract between plaintiff and defendants. Therefore it now appears that *Boys Markets* did not apply and that the restraining order was improvidently granted.

Operating Engineers took the position that the assembly should be done by its members and members of the Iron Workers.

On the next day the plaintiff sent a telegram to the Impartial Jurisdictional Disputes Board chairman stating that "[t]he Operating Engineers business agent (Joseph Delaney) refused to allow the crane operator to work if the steamfitters were to participate in assembling the crane. This action by the Operating Engineers has created a work stoppage on the job . . .," and requesting an immediate decision by the Board. It concluded "ACMAT Corporation will abide by the decision of the Board." The same day the chairman of the Board wired to the General President of the International Operating Engineers, with copies to the United Association of Iron Workers, requesting that he direct the local union to return to work immediately.

### The Section 301 Claim

█ Section 301 permits suits for violation of contracts between an employer and a labor organization. 29 U.S.C. § 185(a).[3] This court has jurisdiction to determine whether there was such a contract between the plaintiff and defendants, and if so, whether it was breached. *See Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241–45, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Genesco, Inc. v. Joint Council 13, United Shoe Workers of America,* 341 F.2d 482, 484 (2d Cir. 1965); *see also Smith v. Evening News Association,* 371 U.S. 195, 199–200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

The defendants contend that there was no contract between any of them and the plaintiff. As might be expected, ACMAT argues that such a contract between it and the defendants did exist.

For its claim the plaintiff relies not on one, but on at least three agreements to reach the "no strike" provision which was

allegedly breached. The no strike provision is found in Article VII, Sec. 1 of the Plan for Settlement of Jurisdictional Disputes in the Construction Industry:

"During the existence of this Agreement there shall be no strikes or work stoppages arising out of any jurisdictional dispute."

All trade unions who are members of the Building and Construction Trades Department, AFL–CIO, including each of the defendant unions and also the Steamfitters Union, are parties to the Plan. On the employers' side, all of the various trade associations composed of employers in the construction industry, of which ACMAT is one, are also parties to the Plan. Thus, for all employers and unions who signified their consent to be bound by the Plan, it is as·if the Plan became incorporated by reference in all collective bargaining agreements between a union and an employer.

However, none of the defendants were parties to any collective bargaining agreement with ACMAT. ·The plaintiff proposed to overcome this deficiency by invoking an on-site oral agreement between the iron workers and the steamfitters that a composite crew of steamfitters and iron workers would assemble the crane. What is referred to as the on-site arrangement is described in ¶ 9 of the First Count of the Complaint:

"On or about August 19, 1974 Plaintiff assigned the work of assembling and setting of the crane jointly to the Iron Workers Local 15 and 424 and to Steamfitters Local No. 218 of Hartford, Connecticut. Said work was to be done by a crew consisting of equal numbers of members of the Iron Workers Union and the Steamfitters Union. Further, prior to August 19, 1974, the business agents for both the Iron Workers and the Steamfitters acknowledged that they would abide by the assignment on the basis that

---

**3.** 29 U.S.C. § 185(a) provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be

brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

the work crew would consist of an equal number of steamfitters and iron workers." (Emphasis added).

Though it had no collective bargaining agreement with either the operating engineers or the iron workers, ACMAT argues that both it and the defendants were members of the Plan, and had agreed to be bound by it, and therefore the on-site agreement created an obligation on defendants' part to refrain from striking.

The initial question is whether what is underscored above resulted in a § 301 contract between ACMAT and the defendants. It is difficult to resolve this as a single problem without considering several closely related matters. In considering whether there was a contract, two events which preceded the "on-site" agreement have more than historical interest. In the first place, it appears that ACMAT had a collective bargaining contract with the Steamfitters which contained a provision relevant to this case. Article XVI of ACMAT's contract with the Steamfitters provides in part:

"The unloading, handling, rigging, setting and connecting up of boilers and other vessels shall be the job of the Steamfitters, but when the Employer does not have the specialized rigging equipment for a heavy rigging job and he hires or contracts for such equipment, the Steamfitters shall consist of not less than fifty (50%) percent of a composite crew for rigging only. . . . . The Employer agrees to notify the Business Agent whenever rigging work is subcontracted."

Secondly, prior to undertaking to obtain the on-site agreement that the work of assembling the crane be divided between the Steamfitters and the Iron Workers, ACMAT had already contracted with the Christie Rigging and Trucking Company to assemble the crane, and with the Lee Crane Service to furnish the operating engineers to operate it. The papers filed with the court disclose that Christie Rigging had an arrangement with the Iron Workers to do the work of assembling the crane, and that such assembly work was customarily done by a crew comprised of members of the Operating Engineers and the Iron Workers Unions.

■ Thus, ACMAT's relationship to the defendant unions is highly oblique. As indicated by ACMAT's collective bargaining agreement with the Steamfitters and its subcontracts with Christie Rigging and Lee Crane, ACMAT was not to become a direct employer of members of either of the defendant unions. Indeed, Lee Crane billed ACMAT for the services of the Operating Engineers and Christie billed ACMAT for the services of the Iron Workers. While a contract to be cognizable under Section 301 need not be a collective bargaining agreement, it must be an agreement between ". . . employers and labor organizations significant to the maintenance of labor peace between them. . . ." Retail Clerks v. Lion Dry Goods, Inc., 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962). Stemming from the absence of any direct employment relationship is the argument that since the defendant Iron Workers were to be paid by Christie for work to be done for Christie, ACMAT furnished no consideration for any promise their business agent may have made.

Furthermore, it is clear that the Steamfitters furnished no consideration to the Iron Workers. Although they may have had a colorable claim to the work under their contract with ACMAT, it does not appear that they had any claim at all against Christie. Steamfitters were not then employed by Christie and had no prior service with it. On the other hand, Christie had a collective bargaining agreement with the Iron Workers of Local 15 (Ans. to Int. 50).

Stressing the true role of ACMAT as having only the rights of a contractor against its subcontractor, Christie Rigging, the defendants contend that the plaintiff never obtained any contractual rights against the defendant unions. Any members of the Iron Workers who were to be employed by Christie were to remain as Christie's employees. Furthermore, any suggestion that Iron Workers would be sub-

jected to two masters must be rejected because that would be contrary to established custom in the construction industry. The Procedural Rules and Regulations of the Impartial Jurisdictional Disputes Board, which ACMAT seeks to invoke in this case, are pertinent. The very first subject of those rules concerns "Contractors' Responsibility."

"1. The contractor who has the responsibility for the performance and installation shall make a specific assignment of the work which is included in his contract. For instance, if contractor A subcontracts certain work to contractor B, then contractor B shall have the responsibility for making the specific assignment for the work included in his contract.

. . . .

"The Board will not render advisory opinions or decisions regarding initial assignments of work. The initial assignment must be made by the contractor or subcontractor responsible for its performance."

While the "Contractors' Responsibility" clause would not taint ACMAT's alleged on-site agreement with illegality, it may be used to shed light on the true character of the on-site arrangement.

When attention is more sharply focused on the work which ACMAT was attempting to obtain for the Steamfitters, it is clear that the work of assembling the crane was never staked out for the Steamfitters. The only claim which they may have had under their contract with ACMAT was to ". . . fifty (50%) percent of a composite crew for rigging only." There is a marked difference between the work of assembling a crane so that it can be fully operational, and its operation thereafter for rigging boilers and other equipment, which the Steamfitters were to install and connect up. That difference is emphasized by the fact that one contract was made with Christie Rigging and Trucking Company to assemble the crane, and another contract

was made with Lee Crane Service to operate it.

Ordinarily the general contractor, who is ultimately responsible for the entire job, might have a say in the assigning of all work to be done on the job. However, there are special arrangements among contractors, subcontractors, and employees in the building industry, and it is not too far-fetched to assume that ACMAT was aware of the relationship between its subcontractors and their employees.[4] ACMAT was not confronted with two groups of its employees who were at the time engaged in the integrated operation of constructing the building. What ACMAT sought was that *Christie* hire workers who were already ACMAT's employees.

Assuming that the character of the "agreement" was such as to be cognizable under § 301, the basic question is whether it satisfied the substantive common law requirements for a contract. Even if, as the papers filed in support of the plaintiff's contention disclose, the business agent of the Iron Workers agreed with ACMAT that the assembly work was to be shared between a composite crew of Iron Workers and Steamfitters, it would not necessarily follow that the Iron Workers became contractually obligated to do so.

 It is elementary that "[a]greement has a wider meaning than contract, bargain, or promise. The word contains no implication that legal consequences are or are not produced." 1 *Restatement of Contracts* § 3, Comment a (1932).

In order for a promise to be binding on the promisor, there must be consideration for it. No employer-employee relationship between ACMAT and the Iron Workers was ever contemplated. The Iron Workers were never hired by ACMAT to do the work of assembling the crane. The Iron Workers were not contractually obligated to work

---

4. The itemized bill to ACMAT from Christie shows 8 hours' time by an Iron Worker foreman on September 3 and 8 hours on September 4, and 2 hours on the 3rd and 8 hours on the

4th by an Iron Worker. (It took only one day to reassemble the crane after it was returned to Boston).

for ACMAT. It follows that even if it is assumed [5] that the Iron Workers refused to comply with a request by ACMAT to do the work, such refusal was not a breach of any contract with ACMAT. Since this conclusion is based upon facts set forth above as to which there is no material dispute, summary judgment dismissing Count 1 based on § 301 may be entered.

### The Section 303 Claim

Plaintiff's second claim is made under § 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b), which creates a federal cause of action against labor organizations for damages caused by the unfair labor practices defined in § 8(b)(4), 29 U.S.C. § 158(b)(4).[6] The defendant unions are charged with a jurisdictional strike, for which ACMAT could have sought proceedings before the National Labor Relations Board under §§ 8(b)(4)(D) and 10(k) of the Act, 29 U.S.C. §§ 158(b)(4)(D), 160(k).[7] The Iron Workers and Operating Engineers claim that the decision of the Impartial Jurisdictional Disputes Board, which assigned the disputed work to them,[8] constituted a finding that they committed no

5. ACMAT does not claim that it made any agreement with the Operating Engineers. It seems senseless to base a claim against the Iron Workers on the ground that "The Operating Engineers' Business Agent refused to allow the crane operator to work if the Steamfitters were to participate in assembling the [140-ton] crane." (Without an operator for the crane it could not be assembled.)

6. Section 303 reads:
"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended.
"(b) Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

7. Section 8(b)(4)(D) is as follows:
"(b) It shall be an unfair labor practice for a labor organization of its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work . . . ."

Section 10(k) provides:
"(k) *Hearings on jurisdictional strikes.* Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 8(b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

8. The Impartial Board's decision, as announced in a letter to all parties, reads as follows:
"At its meeting September 5, 1974, the Impartial Jurisdictional Disputes Board considered the jurisdictional dispute involving the International Union of Operating Engineers, the International Association of Bridge Structural and Ornamental Iron Workers and the United Association of Journeymen and Apprentices of the Plumbing Pipe Fitting Industry over assembly of crane, Hartford Fire Insurance project, Hartford Connecticut, Standard Builders Inc contractor, ACMAT Corporation subcontractor.
"The Board found that the work in dispute is the assembly of a tower crane and voted that it shall be assigned to a composite crew of iron workers and operating engineers on the basis of trade practice.
"This action of the Board was predicated upon particular facts and evidence before it regarding this dispute and shall be effective on this particular job only."

unfair labor practice by refusing to work. They argue that this finding creates a collateral estoppel on the issue of entitlement to the disputed work, which bars plaintiff's suit for damages under § 303. ACMAT maintains that the Impartial Board determined only that the work would prospectively be assigned to the defendants, and not that they were "entitled" to perform it. ACMAT further argues that the decision of a private body cannot be given the collateral effect of a public administrative ruling, and that the Impartial Board's procedures do not meet the standards applied to administrative decisions when they are invoked in subsequent litigation.

In the LMRA, Congress created two distinct remedies and procedures for jurisdictional strikes. In § 10(k), it empowered the NLRB to "hear and determine" the underlying dispute in a special, expedited proceeding, requiring dismissal of the charges when the dispute is voluntarily adjusted by the parties. In § 303(b), it established a damages remedy for parties "injured in [their] business or property" by jurisdictional strikes and other unfair labor practices defined by § 8(b)(4). The parameters of the relationship between unfair labor practice proceedings and damage suits have remained unsettled, and the relationship is still more unclear when a private dispute resolution mechanism has been substituted for the adjudicative processes of the NLRB. The Supreme Court has held that an action may be brought under § 303 without any prior administrative determination under §§ 8(b)(4)(D) and 10(k) that an unfair labor practice has been committed. *International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 244, 72 S.Ct. 235, 96 L.Ed. 275 (1952). The Court subsequently reasoned that no "substantive symmetry" between the two procedures is required by the Act, and declined to consider "what effect a decision of the [NLRB] under § 10(k) might have on actions under" § 303. *NLRB v. Radio & Television Broadcast Engineers Local 1212*, 364 U.S. 573, 585, 81 S.Ct. 330, 337, 5 L.Ed.2d 302 (1961).

But the latter case did not arise under § 303, and the Court's dictum that "substantive symmetry" between §§ 8(b)(4)(D) and 10(k) and § 303 is not required rested only on the *Juneau Spruce* holding that unfair labor practice proceedings are not a prerequisite to a damages action. The Court has had no opportunity to review the effect of prior unfair labor practice proceedings upon a § 303 action.

■ Section 303 of the Act, like § 301, creates a federal cause of action to protect interests defined in the Act. Therefore the federal courts must fashion the substantive law to be applied under § 303 "from the policy of our national labor laws," as the Supreme Court has required under § 301. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). In particular, the Congressional policy regarding jurisdictional strikes should be closely examined. While numerous decisions have involved the relationship between unfair labor practice proceedings and damages actions in the context of secondary boycotts, *see, e. g., International Wire v. Local 38, IBEW*, 475 F.2d 1078 (6th Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150*, 436 F.2d 1064 (9th Cir. 1971), very little litigation under § 303 has concerned jurisdictional strikes.

By its terms, § 8(b)(4)(D) declares that jurisdictional strikes are unfair labor practices. The only exception made in that paragraph applies to a strike against an employer who has failed to comply with an NLRB order or certification. However, "[w]hen a § 8(b)(4)(D) charge is filed and there is reasonable cause to believe that an unfair labor practice has been committed, issuance of the complaint is withheld until the provisions of § 10(k) have been satisfied." *NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 123–24, 92 S.Ct. 360, 365, 30 L.Ed.2d 312 (1971). When the parties to a jurisdictional dispute have complied with an NLRB determination under § 10(k) or have voluntarily settled or arbi-

trated their dispute, § 10(k) provides that unfair labor practice charges under § 8(b)(4)(D) are dismissed. Thus, in many cases where strikes meeting the definition in § 8(b)(4)(D) have taken place, the NLRB has been precluded from adjudicating unfair labor practice charges. *See ITT Corp. v. Local 134, IBEW,* 419 U.S. 428, 439, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975); *NLRB v. Radio & Television Broadcast Engineers Local 1212, supra,* 364 U.S. at 576–77, 81 S.Ct. 330.

■ Even if § 10(k) proceedings do not bring the dispute to a close, unfair labor practice hearings may not take place. The Board will not press a § 8(b)(4)(D) charge against a union if it awarded the disputed work to that union under § 10(k). *See* 29 C.F.R. § 102.91; *ITT Corp. v. Local 134, IBEW, supra,* 419 U.S. at 446, 95 S.Ct. 600.

> "[F]or all practical purposes the Board's award [under § 10(k)] determines who will prevail in the unfair labor practice proceeding. If the picketing union persists in its conduct despite a § 10(k) decision against it, a § 8(b)(4)(D) complaint issues and the union will likely be found guilty of an unfair labor practice and be ordered to cease and desist. On the other hand, if that union wins the § 10(k) decision and the employer does not comply, the employer's § 8(b)(4)(D) case evaporates and the charges he filed against the picketing union will be dismissed." *NLRB v. Plasterers' Local Union No. 79, supra,* 404 U.S. at 127, 92 S.Ct. at 367.

The NLRB thus recognizes an "entitlement defense" to § 8(b)(4)(D) charges: a union that is entitled to disputed work

> "may use the 'traditional right of self help,' *Rotenberg v. Plumbers Local 15,* D.Minn.1969, 304 F.Supp. 880, 884, in order to coerce the employer into the assignment of that work to its members. *NLRB v. Radio Engineers Local 1212,* 1961, 364 U.S. 573, 577 n.12, 81 S.Ct. 330, 5 L.Ed.2d 302; *NLRB v. Des Moines Electrotypers' Union No. 84,* 8 Cir. 1961, 291 F.2d 381; *Rotenberg v. Plumbers Local 15, supra.* This forms an exception which has been engrafted onto the law by

the NLRB, *see NLRB v. Radio Engineers Local 1212, supra,* 364 U.S. at 577 n.12, 81 S.Ct. 330." *Bechtel Corp. v. Local 215, Laborers' International Union,* 405 F.Supp. 370, 378 (M.D.Pa.1975), *aff'd in part, rev'd in part,* 544 F.2d 1207 (3d Cir. 1976).

In the instant case, had an unfair labor practice complaint been filed against the defendants under § 8(b)(4)(D), the NLRB would have dismissed the charges, because the dispute was resolved by the Impartial Jurisdictional Disputes Board, a "method for voluntary adjustment," as specified in § 10(k). This court need not decide, however, whether an action for damages, based on the commission of an unfair labor practice, must be dismissed in every instance where the corresponding unfair labor practice charges would clearly have been dismissed. It is not contended here that every voluntary resolution of a jurisdictional dispute will always preclude an action under § 303, but rather that entitlement to the disputed work is a defense to such an action, and that entitlement may be established by the NLRB in § 10(k) proceedings or by a private tribunal chosen by the parties.

■ The policy of our labor laws will be furthered by applying the entitlement defense of § 8(b)(4)(D) to actions under § 303. As a general matter, the decisional law under §§ 8(b)(4) and 10 is considered in deciding cases under § 303. *See, e.g., Painters District Council No. 38 v. Edgewood Contracting Co.,* 416 F.2d 1081, 1083 (5th Cir. 1969); *Riverside Coal Co. v. United Mine Workers,* 410 F.2d 267, 272 n.3 (6th Cir.), *cert. denied,* 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969). We have seen that a unique policy applies to jurisdictional strikes, as distinguished from other unfair labor practices. A striking union is in effect absolved of the unfair labor practice charge if it is found to be entitled to the work *or* if the underlying dispute is privately settled. In part this is because § 10(k)

> "quite plainly emphasizes the belief of Congress that it is more important to industrial peace that jurisdictional dis-

putes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed upon labor unions." *NLRB v. Radio & Television Broadcast Engineers Local 1212, supra*, 364 U.S. at 576–77, 81 S.Ct. at 333. But it is also the NLRB's policy to preserve a union's right to concerted activity in a jurisdictional dispute if the union's claim to the work is valid. If the union had to respond in damages for the same concerted activity, this limited right of self-help would be thwarted. Thus, in *Bechtel Corp. v. Local 215, Laborers' International Union, supra*, the district court held that the entitlement defense should apply in an action under § 303.[9]

In another case, where a striking union was denied disputed work under § 10(k) and subsequently found by the NLRB to have committed an unfair labor practice, this finding was held to raise a collateral estoppel against the union in a § 303 action. *Eazor Express, Inc. v. General Teamsters Local 326*, 388 F.Supp. 1264 (D.Del.1975). A majority of courts have reached similar results in secondary boycott cases. *See International Wire v. Local 38, IBEW*, 475 F.2d 1078 (6th Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150*, 436 F.2d 1064 (9th Cir. 1971); *Painters District Council No. 38 v. Edgewood Contracting Co.*, 416 F.2d 1081 (5th Cir. 1969); *Whitman Electric Inc. v. Local 363, IBEW*, 398 F.Supp. 1218 (S.D.N.Y.1974). *See generally* Dawson, *Why a Decision By the NLRB Under 8(b)(4) Should Be Determinative In a Subsequent Section 303 Damage Suit*, 27 Okla.L.Rev. 660 (1974). *But see Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Local 584*, 281 F.Supp. 971 (E.D.N.Y.1968). If, as

in *Eazor Express*, an NLRB finding adverse to a union is given collateral estoppel effect, then a favorable finding should also apply collaterally. The question remaining is whether the entitlement defense can be established by the decision of private arbitrators. The NLRB has had no occasion to consider whether a private board's decision can establish the entitlement defense. Under § 10(k), it dismisses § 8(b)(4)(D) charges whenever a private arbitration is concluded, regardless of whether the striking union was awarded the work.

ACMAT argues that no entitlement defense can be predicated on the Impartial Jurisdictional Dispute Board's decision. First, it maintains that the Impartial Board did not decide which unions were "entitled" to the work, but rather assigned the work prospectively to the defendant unions. This argument confuses form with substance. While its decision was stated in the future tense ("[T]he work in dispute . . . shall be assigned . . ."), the Impartial Board was asked to decide which unions should perform the work at the time the dispute arose, and it clearly decided that question "on a basis of trade practice." ACMAT argues that the decision established no entitlement to the work because it was limited to this job and stated no general rule for similar jobs. But the narrowness of the decision reflects only the narrowness of the dispute and of the facts presented to the Impartial Board.[10] It is sufficient that the Impartial Board settled this dispute; no other job is relevant here.

■ ACMAT argues that "entitlement" is a term of art, and that a union can only be "entitled" to work in three situations: where a collective bargaining agreement unambiguously establishes its right to do

---

9. In the *Bechtel Corp.* case, the district court held that the work assignment dispute was arbitrable, and stayed the employer's § 303 action pending the arbitrator's decision. On appeal, the work assignment dispute was held not to be arbitrable and was submitted instead to the National Joint Board for the Settlement of Jurisdictional Disputes in the Building and Construction Industry (predecessor of the Impartial Board which decided this dispute). The

court of appeals found it unnecessary to decide whether the entitlement defense would apply under § 303. *Bechtel Corp. v. Local 215, Laborers' International Union*, 544 F.2d 1207, 1213–15 (3d Cir. 1976).

10. The Procedural Rules of the IJDB require that such a decision be limited to the particular dispute presented. See note 11, *infra*.

the work, where the NLRB has certified it as bargaining representative of the employees doing the work, or where its members have traditionally and exclusively performed the work. But § 10(k) directs the NLRB to determine the dispute, without limiting the possible grounds of decision. Here the Impartial Board acted as a private substitute for the NLRB under § 10(k). The Supreme Court has rejected the contention that a § 10(k) decision must be based on a collective bargaining agreement or an NLRB certification order. *NLRB v. Radio & Television Broadcast Engineers Local 1212, supra,* 364 U.S. at 577–80, 81 S.Ct. 330. Other factors, such as local custom, relevant skills and employer preference, are regularly considered by the NLRB. *See, e.g., NLRB v. St. Louis Printing Pressmen Union No. 6,* 385 F.2d 956 (8th Cir. 1967); *New Orleans Typographical Union No. 17 v. NLRB,* 368 F.2d 755 (5th Cir. 1966); *NLRB v. Local 1291, International Longshoremen's Association,* 368 F.2d 107 (3d Cir. 1966), *cert. denied,* 386 U.S. 1033, 87 S.Ct. 1482, 18 L.Ed.2d 595 (1967).

Plaintiff further argues that no collateral estoppel can attach to the decision of the Impartial Board because its procedures fail to meet the standards of due process. It relies on *Eazor Express v. General Teamsters Local 326, supra,* where the court stated the considerations which led it to apply a collateral estoppel to an NLRB decision. Among these were:

"... Local 326 had the right 'to appear in person or otherwise and give testimony' before the Administrative Law Judge. The statute requires that such proceedings be, 'so far as practicable ... conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure.' The Board's decision must 'state its findings of fact' and must be based on 'the preponderance of' the evidence adduced; any person aggrieved may obtain direct review under section 10(f), 29 U.S.C. § 160(f), in the Court of Appeals, where the Board's findings of fact are conclusive only if supported by 'substantial evidence on the record considered as a whole.' " *Eazor Express, Inc. v. General Teamsters Local 326, supra,* 388 F.Supp. at 1267.

The standards discussed in *Eazor Express* and other cases are derived from the Supreme Court's statement that

"[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966) (citations omitted).

From these discussions, plaintiff concludes that a collateral estoppel cannot arise from the decision of a private body, but only from "an administrative agency . . . . acting in a judicial capacity." In the alternative, it argues that a private body's procedures must meet the standards prescribed for administrative agencies.

 It is well established that the decision of a private arbitrator can create a collateral estoppel. *Ritchie v. Landau,* 475 F.2d 151 (2d Cir. 1973); *James L. Saphier Agency, Inc. v. Green,* 190 F.Supp. 713 (S.D.N.Y.), *aff'd,* 293 F.2d 769 (2d Cir. 1961). This was noted by the Supreme Court in the *Utah Construction* case, in the sentence immediately following the one cited by AC-MAT and quoted above. *United States v. Utah Construction & Mining Co., supra,* 384 U.S. at 422, 86 S.Ct. 1545. "No satisfactory reason can be assigned why an [arbitration] award, which the parties have expressly stipulated should be final as to the subject submitted, should not be as conclusive as a court-rendered judgment." *Corey v. Avco-Lycoming Division,* 163 Conn. 309, 318, 307 A.2d 155, 160 (1972), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 903, 34 L.Ed.2d 699 (1973). Of course, an award is only binding as to the specific facts presented to the arbitrator. *United Electrical Radio & Machine Workers v. Honeywell, Inc.,* 522 F.2d 1221, 1228 (7th Cir. 1975); *International Chemical Workers Local 189 v. Purex Corp.,* 427 F.Supp. 338 (D.Neb.1977); *International*

*Union, UAW v. Weatherhead Co.,* 203 F.Supp. 612 (N.D.Ohio 1962), *aff'd,* 316 F.2d 239 (6th Cir. 1963).

Plaintiff is also mistaken in its assumption that the procedures of a private body, to which parties voluntarily submit their disputes, must be reviewed by the same standards as the procedures of a court or administrative agency, to which the law requires submission. The parties who agree to be bound by an arbitrator's decision have decided for themselves whether they will be afforded sufficient opportunity to be heard and whether the arbitrator's impartiality is assured. ACMAT had a right to submit detailed written materials to the Impartial Board and to be heard in person at its meeting, but it did not avail itself of these opportunities.[11] It may not be heard to complain now that the Impartial Board's procedures were inadequate. Collateral estoppel applies to an issue of fact actually contested and decided in arbitration proceedings if that issue was properly before the arbitrator. *See James L. Saphier Agency, Inc. v. Green, supra.*

The court's inquiry is thus properly confined to whether ACMAT and the various unions agreed to let the Impartial Board decide who was entitled to the work. As discussed above, there was no collective bargaining agreement between plaintiff and defendants, requiring them to follow the procedures in the Plan for Settlement of Jurisdictional Disputes in the Construction Industry. But it is not disputed that at the time of the work stoppage, ACMAT and the unions agreed to be bound by the Impartial Board's decision. ACMAT explicitly agreed to be bound when it submitted the dispute.[12] Each of the defendant unions, local and international, has indicated in some form its understanding that the decision

11. A summary of the Impartial Board's procedures is appropriate at this point:

All parties requesting job decisions from the IJDB must supply an account of the events leading to the dispute, a detailed description of the work involved, and other information. Procedural Rules and Regulations of the Impartial Jurisdictional Disputes Board and Appeals Board Procedures, June 1, 1973, at 9–10. If the Board finds that no "applicable decision or agreement of record" covers a jurisdictional dispute, it must base its decision on "established trade practice and prevailing practice in the locality." *Id.* at 11–12. Unless the specific terms of an agreement or prior decision govern the case, the following procedures are required:

"(c). When the Board has decided to process a dispute on the basis of 'prevailing practice,' the International Unions involved shall be allowed ten working days in which to submit such evidence to the Board. The International Unions shall be notified of this period in each case processed on the basis of 'prevailing practice.'

"Such notice must also include a clear definition of the work on which prevailing practice is to be secured and the locality from which evidence will be received which will be the same for both trades and will be, unless otherwise specified, the geographical jurisdiction of the Local Building and Construction Trades Council in which the project is located. The Board will consider only evidence which identifies projects within this locality and indicates the contractor on the project. It is desirable wherever possible for the evidence to show the year the work was performed and the amount of work involved.

"6. Each job decision of the Board shall be sent to the affected parties and state that the job decision was predicated upon the particular facts and evidence before the Board regarding the dispute and shall be effective on the particular job only."

*Id.* at 12–13.

Parties submit their positions in writing to the Board, but representatives of International Unions, employers and employer associations are entitled to attend the Board's meeting "and participate in the discussion of a particular case." *Id.* at 14–15.

Employers and unions are entitled to a rehearing by the Board. At the second hearing they may present written evidence and witnesses. *Id.* at 13–14. A further appeal may be taken to a separate Appeals Board by an International Union, a contractor or a contractor association. *Id.* at 17–21.

ACMAT did not send a representative to the IJDB's meeting. The only evidence it submitted to the Board was a brief description of the Iron Workers-Steamfitters "on-site agreement" and the ensuing work stoppage in its August 20 letter requesting a job decision. Affidavit of Bryan H. Marsh, March 11, 1977.

12. Letter from Bryan H. Marsh, Vice President, to William J. Cour, Chairman, Impartial Jurisdictional Disputes Board, August 29, 1974, at 2; *see also* Plaintiff's Answers to Interrogatories of Defendants Other Than International Association of Iron Workers, no. 7, at 4.

was binding.[13] The record does not reveal to what extent the defendants participated in the Impartial Board's procedures, or what written material they submitted. But ACMAT has not refuted the unions' assertion that "the defendants, together with the plaintiff, participated under [the Impartial Board's] rules for determining the work assignment."[14] When the dispute arose, the parties may have mistakenly believed that they were already bound to submit it to the Impartial Board; it matters only that they then agreed to be bound. *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967); *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 656 (9th Cir. 1964), *cert. denied*, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965); *Cohen v. Cohen*, 17 A.D.2d 279, 283, 233 N.Y.S.2d 787, 791 (1962).

 It is particularly necessary that courts uphold and respect the decisions of arbitrators in labor disputes, where private dispute resolution plays a unique and crucial role. *See, e.g., United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). In jurisdictional disputes, as discussed above, Congress and the NLRB have adhered to a particularly strong preference for private dispute resolution:

"The Board has consistently interpreted section 10(k) so as to confer an important role upon voluntary methods of adjustment of work-assignment disputes, which are made a part of the statutory scheme in the proviso to section 10(k). The proviso, which in effect precludes a Board determination, has been considered to be operative whenever the employer and employees involved have made an agreement to settle the dispute privately, even though one of these parties may have later repudiated that agreement or rejected the decision made at the private forum." Note, *Work-Assignment Disputes Under the National Labor Relations Act*, 73 Harv.L.Rev. 1150, 1162 (1960) (footnote omitted).

*See Wood Lathers International Union*, 119 N.L.R.B. 1345 (1958).[15] Jurisdictional issues are appropriate for binding private resolution, unlike issues of representation, which for obvious reasons can only be resolved by the NLRB. *See Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 801–02 (5th Cir. 1973); *Local 7–210, Oil, Chemical & Atomic Workers v. Union Tank Car Co.*, 475 F.2d 194, 199 (7th Cir.), *cert. denied*, 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973). *See generally Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 268–69, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). The Impartial Board's decision that the defendants were entitled to the disputed work should therefore be regarded as final and binding.

 There is an additional reason why ACMAT should be denied recovery under § 303. ACMAT was never faced with a dispute among its own employees represented by rival unions. It intervened in the affairs of its subcontractors and arranged for the assignment of subcontracted work to a favored union. The walkout resulted from this unnecessary intermeddling.

---

13. Mailgram from Frank Hanley, Assistant to General President, International Union of Operating Engineers, to McNeill, Stokes, Boyd and Shapiro [*sic*], August 29, 1974; Answer of Defendant International Association of Bridge, Structural and Ornamental Iron Workers to Plaintiff's First Continuing Interrogatories, no. 3, at 3; Answer of Defendant Operating Engineers Local 478 to Plaintiff's First Continuing Interrogatories, no. 5, at 2; Answer of Defendant Iron Workers Local 424 to Plaintiff's First Continuing Interrogatories, no. 3, at 2; Answer of Defendant Iron Workers Local No. 15 to Plaintiff's First Continuing Interrogatories, no. 3, at 2. *See also, e.g.,* Answer of International Union of Operating Engineers and Operating Engineers Local 478 to First Amended Complaint, Special Defenses 3 and 4.

14. Defendants' Memorandum in Support of Motion to Dismiss and Motion for Summary Judgment, at 12.

15. Even after the NLRB has assumed jurisdiction over such a dispute, a proper demand for arbitration will be honored. *See Local 771, I.A.T.S.E. v. RKO General, Inc.*, 546 F.2d 1107 at 1114 (2d Cir. 1977).

"The decisions of the Supreme Court . . . have made it clear that [§ 8(b)(4)(D)] is primarily intended to aid 'employers in the position of neutrals between contending parties', it protects 'the employer only from union pressures designed to involve him in disputes not his own.' *National Woodwork Manufacturers v. N.L.R.B.,* 386 U.S. 612, 625, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967)." *Kaynard v. Transport Workers Union,* 306 F.Supp. 344, 346 (E.D.N.Y.1969).

The legislative history of § 8(b)(4)(D) amply supports this conclusion. Congress did not intend to aid employers who create jurisdictional disputes by intermeddling, but those who are "the helpless victims of quarrels that do not concern them at all." *NLRB v. Radio & Television Broadcast Engineers Local 1212, supra,* 364 U.S. at 581, 81 S.Ct. at 335, *quoting* H.R.Rep. No. 245, 80th Cong., 1st Sess. 23 (1947), *reprinted in* 1 NLRB, *Legislative History of the Labor Management Relations Act, 1947,* at 314 (1948).[16] To award damages to an employer whose intervention has provoked a jurisdictional strike would only frustrate the legislative policy of preventing such strikes.

I find that the material facts with respect to both counts of the complaint are undisputed. Judgment for the defendants shall be entered.

SO ORDERED.

---

**16.** In addition, see 93 Cong.Rec. A 2377 (1947) (extension of remarks of Sen. Ball), *reprinted in* 2 NLRB, *Legislative History of the Labor Management Relations Act, 1947,* at 1524 (1948) (hereafter "*Legislative History*") (employer as "helpless secondary victim"); 93 Cong.Rec. 3954 (1947) (remarks of Sen. Taft), *reprinted in* 2 *Legislative History* at 1012 ("racketeering strikes . . . which are, in effect, attempts to bring indirect pressure on third parties . . ."); 93 Cong.Rec. 4416 (1947) (remarks of Sen. Smith), *reprinted in* 2 *Legislative History* at 1157 ("numerous jurisdictional disputes in which the employer is absolutely innocent, and yet he and the public have been made to suffer, even though they have had absolutely nothing to do with the controversy or the causes of it"). Senator Morse debated the need for control of jurisdictional disputes "in the absence of collusion on the part of the employer." 93 Cong.Rec. 4257 (1947), *reprinted in* 2 *Legislative History* at 1057.