**SPANCRETE NORTHEAST, INC., Plaintiff,**

v.

**INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRONWORKERS and Local 40, International Association of Bridge, Structural and Ornamental Ironworkers, Defendants.**

No. 79–CV–663.

United States District Court,
N. D. New York.

May 7, 1981.

Hayes & Lapetina, Albany, N. Y., for plaintiff; Harry R. Hayes, III, Albany, N. Y., of counsel.

Delson & Gordon, New York City for defendant International; Jeffrey S. Dubin, New York City, of counsel.

Colleran, O'Hara & Kennedy, Garden City, N. Y., for defendant Local 40; Robert A. Kennedy, Garden City, N. Y., of counsel.

## MEMORANDUM—DECISION AND ORDER

McCURN, District Judge.

Spancrete Northeast, Inc., commenced this action [1] pursuant to Section 303 of the Labor-Management Relations Act, 29 U.S.C. § 187, which creates a federal cause of action against labor organizations for damages to business or property caused by the unfair labor practices defined in Section 8(b)(4) of the Act, 29 U.S.C. § 158(b)(4). Specifically, Spancrete charges that defendant Local 40, International Association of Bridge, Structural and Ornamental Ironworkers threatened to engage in a jurisdictional strike unless Spancrete assigned certain construction work to the Ironworkers

---

1. Spancrete began this law suit in state court; subsequently, it was removed to this Court by defendants.

rather than to members of the Laborers Union.

Earlier, in separate but related administrative proceedings initiated by Spancrete, the National Labor Relations Board ("NLRB") determined first that the Laborers rather than the Ironworkers were entitled to perform the disputed work; and second, that although Local 40 did not induce any work stoppage through picketing or otherwise, the union nevertheless committed an unfair labor practice by threatening a jurisdictional strike. Invoking the principles of res judicata and collateral estoppel, Spancrete now moves for summary judgment against Local 40 on the liability issue, and seeks to recover as damages in this § 303 action the attorney and witness fees which it expended pursuing its prior administrative remedies before the NLRB.

Local 40 concedes that res judicata bars relitigation of any facts necessarily determined by the NLRB during the administrative stages of this controversy, but cross-moves for summary judgment or, in the alternative for an order dismissing the complaint for failure to state a claim upon which relief can be granted. In support of these motions, Local 40 contends that where, as here, the underlying unfair labor practice involves only a threat of a jurisdictional strike unaccompanied by picketing or work stoppage, the damages recoverable under § 303 do not include the attorney and witness expenses incurred by the employer in obtaining administrative rulings from the NLRB.

The Court believes that this case is ripe for summary judgment and, for the reasons discussed below, grants summary judgment in favor of Local 40 and the International

Association of Bridge, Structural and Ornamental Ironworkers.[2]

## I.

A brief review of the various mechanisms for resolving labor disputes will serve as a guide to the procedural history of this lawsuit and also illuminate some aspects of the pivotal substantive issue: whether attorney and witness expenses incurred in the successful pursuit of administrative remedies may routinely be recovered as damages in a subsequent § 303 suit against the losing union.

When an employer is faced with a jurisdictional dispute concerning which of two unions is entitled to a particular work assignment, there are commonly three forums available, each of which may provide the employer with different remedies. Moreover, the authority of all three forums may be invoked in the course of settling a single dispute.

First, the parties may agree to submit the jurisdictional dispute to the Impartial Jurisdiction Dispute Board, an arbitration panel established by various employer and union representatives in the construction industry. Where both the employer and the disputing unions have thus, "agreed upon methods for the voluntary adjustment of the dispute," 29 U.S.C. § 160(k), the IJDB's decision ordinarily is binding on the parties and may bar the employer from securing alternative remedies, at least against the successful union. See ACMAT Corp. v. International Union of Operating Engineers, 442 F.Supp. 772, 779–86 (D.Conn.1977) (IJDB decision that defendant unions were entitled to the dis-

---

2. Spancrete's claim against defendant International Association of Bridge, Structural and Ornamental Ironworkers ("International") rests solely on the allegation that certain officers of the International, "encouraged, counselled and approved the conduct of defendant Local 40 in attempting unlawfully to coerce the plaintiff to assign its work to members of Local 40." Complaint, ¶ 16. While neither Spancrete nor the International has moved for summary judgment on International's liability, the fact remains that plaintiff seeks to recover the above-

described damages from the International and Local 40 jointly, and no other items of damage are asserted against International. Since the Court holds on the instant motions that the damages sought to be recovered against both defendants are noncompensable as a matter of law, it would elevate form over substance to require International to move separately for summary judgment. See C. Wright & A. Miller, Federal Practice and Procedure: Civil §§ 2719, 2720.

puted work is final and binding and bars employer's claim for damages under § 303). Where, on the other hand, the unions have submitted the claim to the IJDB but the employer has not agreed to be bound thereby, a work award by the IJDB is not binding on the employer and he may proceed along either of the remedial avenues created by the Labor Management Relations Act, 29 U.S.C. §§ 160(k), 187(b). *See NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971) (upholding NLRB authority to determine merits of jurisdictional dispute notwithstanding an IJDB work assignment, where the competing unions but not the employer had agreed to be bound by the IJDB decision).

■ Second, the employer may file a § 8(b)(4)(D)[3] charge against the union which challenged the employer's work assignment. Where the charge is premised on a jurisdictional dispute, the NLRB is directed, under § 10(k) of the LMRA, to "hear and determine the dispute out of which such unfair labor practice shall have arisen....," unless the parties have agreed upon a method for voluntary adjustment of the dispute.[4] The Board's power to issue a work assignment order in a § 10(k) proceeding is triggered by a threshold finding that there is reasonable cause to believe that a § 8(b)(4)(D) violation has occurred. *Plasterers' Local Union No. 79, supra*, 404 U.S. at 123, n.10, 92 S.Ct. at 365, n.10. In that case the Supreme Court explained the limited impact of the Board's § 10(k) decision itself:

".... (T)he § 10(k) decision standing alone, binds no one. No cease-and-desist order against either union or employer results from such a proceeding; the impact of the § 10(k) decision is felt in the § 8(b)(4)(D) hearing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding. If the picketing union persists in its conduct despite a § 10(k) decision against it, a § 8(b)(4)(D) complaint issues and the union will likely be found guilty of an unfair labor practice and be ordered to cease and desist. On the other hand, if that union wins the § 10(k) decision and the employer does not comply, the employer's § 8(b)(4)(D) case evaporates and the charges he filed against the picketing union will be dismissed. Neither the employer nor the employees to whom he has assigned the work are legally bound to observe the § 10(k) decision, but both will lose their § 8(b)(4)(D) protection against the picketing which may ... shut down the job. 404 U.S. at 126–7, 92 S.Ct. at 367 (footnote omitted).

■ Third, the employer may sue the union under § 303 to redress injuries to business or property caused by the commission of certain unfair labor practices prescribed by § 8(b)(4). While § 303 is an alternative to the pursuit of administrative remedies, the employer may pursue both

---

**3.** Section 8(b)(4) provides that it shall be an unfair labor practice for a union or its agents: "(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

   \*     \*     \*     \*     \*     \*

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work." 29 U.S.C. § 158(b)(4).

It is undisputed that Spancrete is engaged in commerce within the meaning of § 8(b)(4) and that Local 40 is a labor organization within the terms of the statute.

**4.** Section 10(k) provides:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within 10 days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of, the dispute, such charge shall be dismissed." 29 U.S.C. § 160(k).

remedies at the same time or in sequence. *International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952); see generally, R. Gorman, *Basic Text on Labor Law* 291–5 (1976). This Congressional provision of multiple remedies may produce anomalous results in particular cases. As Professor Gorman observed: "It is thus possible for the Board to hold that the union has not violated section 8(b)(4) at the same time as a judge and jury find the union to have violated section 303 on the same facts and to have both decisions affirmed on appeal." *Id.* at 294, citing, *NLRB v. Deena Artware, Inc.*, 198 F.2d 637 (6th Cir. 1952), *cert. denied*, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953) and *United Brick and Clay Workers v. Deena Artware, Inc.*, 198 F.2d 637 (6th Cir.), *cert. denied*, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952). Moreover just as the § 10(k) decision generally determines who will prevail in a subsequent § 8(b)(4)(D) proceeding, the decision rendered in the § 8(b)(4)(D) proceeding may, if *res judicata* applies, determine the outcome on the liability issue in a subsequent § 303 action.

## II.

The underlying facts in this case are no longer in dispute. Spancrete is a New York corporation engaged in the manufacture, sale and installation of pre-cast and pre-stressed concrete building components. Spancrete was engaged by the City of White Plains, New York, to be prime contractor for the fabrication and erection of pre-cast structural concrete for a project known as the City of White Plains Municipal Parking Facility. Pursuant to its collective bargaining agreement with the International Laborer's Union of North America, AFL–CIO ("Laborers") and its agreements with various locals of the Laborers, Spancrete assigned its work under the contract to employees represented by the Laborers.

In early 1979, before work had begun on the project, representatives of Spancrete, Local 40, and the City of White Plains met to discuss Spancrete's assignment of the work to the Laborers. Meanwhile, Local 40 submitted its claim for the disputed work to the Impartial Jurisdictional Dispute Board which in a decision entered on May 4, 1979, awarded the work to members of Local 40. However, because Spancrete had not agreed to be bound by the IJDB decision, neither Spancrete nor the Laborers participated in the IJDB proceeding. Consequently, that decision, far from resolving the dispute, merely provided the ammunition for the opening salvo.

On May 14, 1979, the construction manager and representatives of Local 40 and the City met again to discuss Spancrete's disputed work assignment. Raymond Corbett, Local 40's business manager, referred to the favorable ruling from the IJDB and then informed those present that if Spancrete began the project without reassigning the work to the Ironworkers, Local 40 would "take it down." Plaintiff's Exhibit C (Case No. 2–CD–598, at 6 (January 10, 1980) (Roseburg, A.L.J.)).

Spancrete construed this statement as a threat of a jurisdictional strike, and filed a charge with the NLRB alleging that Local 40 had committed an unfair labor practice in violation of § 8(b)(4)(ii)(D). *See* note 3, *supra*. On June 15, 1979, the NLRB sought and obtained a sixty-day injunction pursuant to § 10(*l*) against any threats to stop work on the construction project. Then, following a hearing pursuant to § 10(k), the NLRB awarded the work to the Laborers employed by Spancrete. 244 NLRB 48 (1979). By letter dated August 15, 1979, Local 40 notified the Regional Director of the NLRB that Local 40 would not comply with the § 10(k) decision, but also stated that Local 40 would not "strike, picket or otherwise interfere with Spancrete Northeast, Inc., in connection with the construction of the Municipal Parking Garage in White Plains, New York." Defendant's Exhibit B.

Thereafter, in November 1979, an unfair labor practice hearing was held before an Administrative Law Judge pursuant to the § 8(b)(4)(D) complaint lodged against Local 40. Based on conflicting testimony of the

participants at the May 14, 1979, meeting, the ALJ found that Corbett's statement that Local 40 would "take it down" constituted a threat to engage in a jurisdictional strike unless Spancrete reassigned the disputed work to the Ironworkers, and concluded that Local 40 had thereby violated § 8(b)(4)(ii)(D). In reaching this conclusion, the ALJ also specifically found that Local 40, "never induced any work stoppages at the construction site through picketing or otherwise." Plaintiff's Exhibit C (Case No. 2–CD–594 at 5, n. 7 [January 10, 1980] [Rosenburg, A.L.J.]). This decision and the ALJ's cease-and-desist order were affirmed by the NLRB, and thereafter Local 40 complied fully with these Board directives. Defendant's Exhibit E.

Meanwhile, in September 1979, Spancrete filed this action in New York Supreme Court seeking damages based on Local 40's alleged violation of § 8(b)(4)(ii)(D) and the defendant International's alleged encouragement thereof. Now, having secured an administrative ruling that Local 40 did violate § 8(b)(4)(ii)(D), Spancrete moves for summary judgment on the liability issue and Local 40 cross-moves for summary judgment on the ground that the damages alleged are not recoverable in a § 303 action.

### III.

■ Before turning to the question of whether the witness and attorneys' fees incurred by Spancrete in the earlier administrative proceedings are recoverable as damages in this § 303 action, some mention should be made of this Court's application of res judicata in this case. Both Spancrete and Local 40 contend that the facts found by the NLRB should not be relitigated in this judicial action. It is now well settled that res judicata or collateral estoppel may attach to the decisions of an administrative agency where, "the factual disputes resolved were clearly relevant to the issues properly before it, and both parties had a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings."

United States v. Utah Construction Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Following the decision in Utah Construction, numerous courts of appeals have applied res judicata to § 8(b)(4) findings in the context of a subsequent § 303 action based on the same unfair labor practice. See e.g., Consolidated Express, Inc. v. New York Shipping Assoc., 602 F.2d 494 (3d Cir. 1979); International Wire v. Local 38, 475 F.2d 1078 (6th Cir. 1973), cert. denied, 414 U.S. 867; Paramount Transport Systems v. Chauffeurs Local 150, 436 F.2d 1064 (9th Cir. 1971). While the Second Circuit has not addressed the point in a case involving § 303, cf. Safir v. Gibson, 432 F.2d 137 (2d Cir. 1970), cert. denied, 400 U.S. 942, 91 S.Ct. 241, 27 L.Ed.2d 246 (1970), and Taylor v. New York City Transit Authority, 433 F.2d 665 (2d Cir. 1970), at least one district court in this circuit has held that res judicata may bar relitigation of factual findings and conclusions of law determined in a prior § 8(b)(4) proceeding. Whitman Electric, Inc. v. Local 363, International Brotherhood of Electrical Workers, 398 F.Supp. 1218, 1221–2 (S.D.N.Y.1974). See also, Eazor Express, Inc. v. General Teamsters Local 326, 388 F.Supp. 1264 (D.Del.1975); Dawson, "Why a Decision By the NLRB Under 8(b)(4) Should Be Determinative In a Subsequent Section 303 Damage Suit," 27 Okla. L.Rev. 660 (1974). Cf. ACMAT Corp. v. International U. of Operating Engineers, 442 F.Supp. 772, 782–5 (D.Conn.1977) (collateral estoppel attaches a decision by the IJDB that the charged union is entitled to the disputed work so as to support judgment for union in subsequent § 303 suit).

■ I find that the Utah standards were met in this case. Both Spancrete and Local 40 participated in the NLRB hearing and each was represented by counsel. The ALJ's findings that Local 40 never induced any work stoppage and that Corbett made the statements attributed to him by the other testifying participants at the May 14th meeting, were relevant to his determination that Local 40 violated § 8(b)(4)(ii)(D) by threatening a jurisdictional strike. Finally, since neither party has suggested

that any injustice would result from a determination that the NLRB's conclusions of law are binding in this action, I accept those conclusions as final for the purposes of this lawsuit. Contrary to Spancrete's contentions, however, the conclusive effect of the NLRB's finding that Local 40 committed an unfair labor practice does not, standing alone, entitle Spancrete to summary judgment on Local 40's liability in this § 303 damages action. Rather, the dispositive issue yet to be resolved is whether the damages alleged by Spancrete are compensable, assuming, of course, that they were actually incurred.

## IV.

█ The so-called American Rule provides that absent statutory authorization, litigants generally must pay their own attorneys' fees and the successful party is not entitled to collect those fees from the losing party. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975). While the Second Circuit has not addressed the question, the prevailing view holds that attorneys' fees spent in litigating the § 303 suit itself are not recoverable from the losing party, and Spancrete does not challenge this reading of the statute.[5] Rather, the issue presented here is whether an employer who is successful in prior administrative proceedings can escape the American Rule by the simple expedient of alleging as its sole damages in a subsequent § 303 suit, the attorneys' fees and witness expenses that were incurred in the administrative proceedings.

Those cases in which this question was raised have yielded different results. A majority of courts have held that the costs of reasonable legal action taken to remove a picket line or to effect a resumption of work are compensable elements of damage in a subsequent § 303 suit. *See e. g., Associated General Contractors v. Construction and General Laborers Local No. 563*, 612 F.2d 1060 (8th Cir. 1979); *Linbeck Const. Corp. v. International Assoc. of Bridge, Structural and Ornamental Ironworkers*, 547 F.2d 948 (5th Cir. 1977); *Teamsters Local 984 v. HumKo Co.*, 287 F.2d 231 (6th Cir. 1961). One rationale underlying this view was expressed by the court in *Associated General Contractors*:

> Reasonable attorneys' fees incurred in effecting resumption of work in effect take the place of other compensable damages which would continue to be suffered if work were not resumed. Aimed at mitigating the losses resulting from a work stoppage, and at preserving the enterprise, they are analagous to costs of subcontracting and overtime.

612 F.2d at 1064.

The Ninth Circuit, on the other hand, has rejected this approach. In *Mead v. Retail Clerks International Association*, 523 F.2d 1371 (9th Cir. 1975), the court held that attorneys' fees incurred in related unfair labor practice proceedings are never recoverable as damages in a subsequent § 303 suit. In denying recovery for attorneys' fees, the court reasoned that: "If attorneys' fees incurred in Board proceedings could be

---

5. The view that Congress did not intend to authorize recovery of attorneys' fees in § 303 suits finds support in the following language in *Teamsters Local 20 v. Morton*, 377 U.S. 252, 260 n. 16, 84 S.Ct. 1253, 1259 n. 16, 12 L.Ed.2d 280 (1964):

   In the Senate debate on the bill, Senator Taft said, "... I see no reason why suits of this sort should not be permitted to be filed. After all, it is only to restore to people who lose something because of boycotts and jurisdictional strikes the money which they have lost." 93 Cong.Rec. 4858. Later, in response to Senator Morse's claim that § 303 would impose virtually unlimited liability, Senator Taft said, "Under the Sherman Act the same

   question of boycott damage is subject to a suit for damages and attorneys' fees. In this case we simply provide for the amount of actual damages." 93 Cong.Rec. 4872–4873. Cases which bar reimbursement for attorneys' fees spent in the § 303 suit itself include: *Pickens-Bond Construction Co. v. United Brotherhood of Carpenters & Joiners, Local 690*, 596 F.2d 1234 (8th Cir. 1978); *F.F. Instrument Corp. v. Union de Tronquistas*, 558 F.2d 607 (1st Cir. 1977); *Sheet Metal Workers v. Atlas Sheet Metal Co.*, 384 F.2d 101 (5th Cir. 1967); and *Navios Corp. v. National Maritime Union*, 236 F.Supp. 657 (E.D.Pa.1964), aff'd 359 F.2d 853 (3d Cir. 1966).

recovered in every case by subsequent section 303 action, it would circumvent the Board's rule allowing recovery of such fees only where the defense is frivolous or in bad faith. . . . It is for the Board, not the courts, to determine whether the conflicting interests are best resolved by imposing litigation costs upon the defeated party before the Board." *Id.*, 523 F.2d at 1381 (citations omitted). The court in *Mead* also observed that the employer had the option of proceeding initially either before the Board or in the courts under § 303. The court reasoned that since the employer could not recover its attorneys' fees attributable to a judicial determination that the union's conduct violated § 8(b)(4), the result should not differ where this determination is first established in a Board proceeding. *Id.*

Finally, in *F.F. Instrument Corp. v. Union de Tronquistas*, 558 F.2d 607 (1st Cir. 1977), the First Circuit reasoned that even if a mitigation of harm theory justifies recovery of attorneys' fees incurred in removing an illegal picket line or effecting a resumption of work, a distinction should be drawn where, "the illegal conduct is over and the Board proceeding is aimed chiefly at securing redress and future protection. . . ." *Id.* at 611. Once this point is reached, the employer's legal expenses become "too remote to be regarded as a component of the damages flowing from the prior wrong." *Id.*

■ It is unnecessary for this Court to choose among these alternative approaches, for even under the liberal rule adopted by the Fifth, Sixth and Eighth Circuits, Spancrete's witness expenses and attorneys' fees are not recoverable. It was determined in Part III of this opinion that principles of *res judicata* and collateral estoppel apply to the prior § 8(b)(4) proceeding so as to bar relitigation of the ALJ's finding that Local 40 never induced a work stoppage through picketing or otherwise. Since the witness expenses and attorneys' fees were not incurred by Spancrete in removing a picket line or effecting a resumption of work, they are not proper elements of damage even under the majority rule. In *Anderson v.*

*International Brotherhood of Electrical Workers, Local 712*, 422 F.Supp. 1379, 1385–86 (W.D.Pa.1976), the court found that the union was liable for plaintiff's lost profits caused by the union's illegal secondary boycott, but, following the majority rule, denied plaintiff's request for attorneys' fees on the ground that plaintiff's restaurant never closed during the illegal activity.

With respect to Spancrete's claim for damages based upon a loss of its employees' time while they appeared as witnesses in the Board proceedings, this Court has considered *Summit Valley Industries, Inc. v. Local 112, United Brotherhood of Carpenters and Joiners of America*, 475 F.Supp. 665 (D.Mont.1979), but concludes that the decision is distinguishable on its facts and does not support a recovery of witness expenses in this case. In *Summit Valley*, the employer incurred attorneys' fees and witness expenses in a successful effort to enjoin the union's illegal picketing, and sought to recover those expenses as damages in a subsequent § 303 action. The court, being bound by the Ninth Circuit's decision in *Mead*, held that plaintiff was not entitled to recover damages for attorneys' fees spent in the prior proceedings. However, the court reasoned that *Mead's* flat prohibition against reimbursement for attorneys' fees did not extend to witness expenses, and held that such witness expenses incurred in NLRB proceedings are recoverable as damages in a § 303 action. *Id.* at 666–67. Unlike the situation in *Summit Valley*, however, the witness expenses alleged by Spancrete in this case were not incurred in an effort to remove illegal pickets or to effect the resumption of work. Rather, like the attorneys' fees discussed above, they were incurred after the isolated threat had occurred and, it is fair to say, in proceedings "aimed chiefly at securing redress and future protection." *F.F. Instrument Corp., supra*, at 611. While it is true that Local 40 notified the Board that it would not comply with the § 10(k) decision awarding the disputed work to the Laborers, it also stated that it would not interfere with the White Plains project during the course of the administrative proceedings. Defendant's Ex-

hibit B. Moreover, Spancrete was not a neutral employer in this case. Spancrete's interest in securing a favorable ruling by the Board is demonstrated by the fact that it had collective bargaining agreements with the Laborers. Moreover, if its initial work assignment was upheld, it could continue to use its current employees on the White Plains project. Finally, give the adverse decision of the IJDB, Spancrete may well have decided that a favorable Board ruling will have a certain precedential impact on future work assignments.

Nothing in *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) suggests that Spancrete is entitled to recover as damages the litigation costs that it expended in the prior NLRB proceedings. In *New York Gaslight Club*, the Court held that sections 706(f) and 706(k) of Title VII of the Civil Rights Act of 1964 authorize a federal court action to recover attorneys' fees spent in state administrative and judicial proceedings. In reaching that result, however, the Court relied in part on statutory language in the Civil Rights Act that has no analogue in § 303 of the LMRA,[6] and also emphasized that under Title VII, "(i)nitial resort to state and local remedies is mandated, and recourse to the federal forum is appropriate only when the State does not provide prompt or complete relief." *Id.* at 65, 100 S.Ct. at 2031.

Unlike the enforcement scheme created under Title VII, § 303 of the LMRA does not mandate prior resort to the NLRB before judicial relief may be obtained. *Intern. L. & W. Union v. Juneau Spruce Corp., supra*, 342 U.S. at 244, 72 S.Ct. at 239. Rather, as shown in Part I of this opinion, Spancrete had the option of proceeding initially in federal court to secure a determination of the legality of the isolated threat of a jurisdictional strike. In light of

this difference in the nature of the enforcement scheme created by § 303, Spancrete's position gains no support from the decision in *New York Gaslight Club. See Kennedy v. Whitehurst*, 509 F.Supp. 226 (D.D.C.1981) holding that the Age Discrimination in Employment Act does not authorize reimbursement for attorneys' fees expended in prior administrative proceedings on the ground, among others, that ADEA does not require prior resort to administrative proceeding.

### ORDER

For all of the foregoing reasons, it is hereby Ordered, Adjudged and Decreed that:

(1) plaintiff's motion for summary judgment is denied;

(2) Local 40's motion for summary judgment is granted;

(3) summary judgment is granted in favor of defendant International Union; and

(4) the complaint is dismissed in its entirety.

---

**6.** Section 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)–5(k) provides that the court may award the prevailing party, "a reasonable attorney's fee as part of the costs," "(i)n any action or proceeding under this title...." In upholding an award of attorneys' fees, the court stated: "Congress' use of the broadly

inclusive disjunctive phrase 'action or proceeding' indicates an intent to subject the losing party to an award of attorney's fees and costs that includes expenses incurred for administrative proceedings." 447 U.S. at 61, 100 S.Ct. at 2029. No such disjunctive phrase was used in § 303 of the LMRA.